1    Richard M. Heimann (State Bar No. 063607)
     Eric B. Fastiff (State Bar No. 182260)
2    Brendan P. Glackin (State Bar No. 199643)
     Marc A. Pilotin (State Bar No. 266369)
3    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
     275 Battery Street, 29th Floor
4    San Francisco, CA 94111-3339
     Telephone:  (415) 956-1000
5    Facsimile:  (415) 956-1008
     E-mail:  rheimann@lchb.com
6            efastiff@lchb.com
             bglackin@lchb.com
7            mpilotin@lchb.com

8    [additional attorneys on signature page]

9    *Attorneys for Plaintiff Bay Area Toll Authority*

10
                    UNITED STATES DISTRICT COURT
11
                   NORTHERN DISTRICT OF CALIFORNIA
12

13

14   BAY AREA TOLL AUTHORITY,              Case No. C 14-01493

15                   Plaintiff,
             v.                            **COMPLAINT**
16
     BANK OF AMERICA CORPORATION;
17   BANK OF AMERICA, N.A.; BANK OF        **JURY TRIAL DEMANDED**
     TOKYO-MITSUBISHI UFJ LTD.;
18   BARCLAYS BANK PLC; CITIGROUP,
     INC.; CITIGROUP FINANCIAL
19   PRODUCTS, INC; CITIBANK, N.A.;
     COÖPERATIEVE CENTRALE
20   RAIFFEISEN-BOERENLEENBANK B.A.;
     CREDIT SUISSE GROUP AG; DEUTSCHE
21   BANK AG; HSBC HOLDINGS PLC; HSBC
     BANK PLC; JPMORGAN CHASE & CO.;
22   JPMORGAN CHASE BANK, NATIONAL
     ASSOCIATION; LLOYDS BANKING
23   GROUP PLC; HBOS PLC; ROYAL BANK
     OF CANADA; THE NORINCHUKIN BANK;
24   THE ROYAL BANK OF SCOTLAND
     GROUP PLC; UBS AG; PORTIGON AG
25   (f/k/a WESTLB AG); WESTDEUTSCHE
     IMMOBILIENBANK AG; BRITISH
26   BANKERS' ASSOCIATION; BBA
     ENTERPRISES LTD.; and BBA LIBOR
27   LTD.,

28                   Defendants.

1.      Plaintiff Bay Area Toll Authority, by its counsel, asserts claims for violations of federal and state statutory law and state common law against the defendants on the U.S. Dollar LIBOR panel ("Panel Bank Defendants") and Defendant British Bankers' Association ("BBA") (collectively, "Defendants") arising from Panel Bank Defendants' suppression of the London InterBank Offered Rate ("LIBOR") from August 2007 to May 2010 (the "Relevant Period").

2.      Plaintiff's claims are made on information and belief (except as to allegations specifically pertaining to Plaintiff and its counsel, which are made on personal knowledge) based on the investigation conducted by, and under the supervision of, Plaintiff's counsel.  That investigation included reviewing and analyzing information concerning Defendants and LIBOR, which Plaintiff (through its counsel) obtained from, among other sources:

(i)      analyses by consulting experts engaged by plaintiffs in *In re LIBOR-Based Financial Instruments Antitrust Litigation*, Master File No. 1:11-md-2262-NRB (S.D.N.Y.) (the "LIBOR MDL Proceedings"), showing that, contrary to fundamental principles of economics and finance, during the Relevant Period, LIBOR deviated from other well-established benchmarks of Panel Bank Defendants' costs of borrowing, namely (a) those banks' respective probabilities of default and (b) the Federal Reserve Eurodollar Deposit Rate;

(ii)      publicly available press releases, news articles, and other media reports (whether disseminated in print or by electronic media);

(iii)      filings Panel Bank Defendants made to the United States Securities and Exchange Commission ("SEC");

(iv)      court documents submitted in LIBOR-related proceedings in Canada, Singapore, and Japan;

(v)      scholarly literature concerning the potential manipulation of LIBOR during the Relevant Period;

(vi)      findings by the United States Department of Justice ("DOJ"), the United States Commodity Futures Trading Commission ("CFTC"), and the United Kingdom's Financial Services Authority ("FSA") issued in June 2012, in connection with settlements with Defendant Barclays Bank PLC, that detail Barclays' misconduct in making false LIBOR submissions to the

Defendant British Bankers' Association ("BBA")—the entity responsible for setting LIBOR—at times in consultation with other banks on the BBA's U.S.-Dollar LIBOR panel, nearly all of whom are Panel Bank Defendants here;[1]

> (vii)    additional facts that emerged in the wake of the Barclays settlements;

> (viii)    findings by the DOJ, CFTC, FSA, and the Swiss Financial Market Supervisory Authority ("FINMA") issued in December 2012, in connection with settlements with Defendant UBS AG, that detail UBS's misconduct in making false LIBOR submissions to the BBA;[2]

> (ix)    findings by the DOJ, CFTC, and FSA issued in February 2013, in connection with settlements with entities affiliated with Defendant The Royal Bank of Scotland Group plc ("RBS"), that detail RBS's misconduct in connection with the manipulation of, *inter alia*, Yen-LIBOR;[3] and;

> (x)    findings by the DOJ, CFTC, and the United Kingdom's Financial Conduct Authority ("FCA") issued in October 2013, in connection with settlements with entities affiliated with Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank"), that detail

---

[1] The agencies' findings concerning Barclays are contained in:  (i) the Statement of Facts incorporated as part of the DOJ's June 26, 2012 non-prosecution agreement with Barclays ("Barclays DOJ Statement"); (ii) the CFTC's Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as Amended, Making Findings and Imposing Remedial Sanctions, dated June 27, 2012 ("Barclays CFTC Order"); and (iii) the FSA's Final Notice dated June 27, 2012 ("Barclays FSA Final Notice").  The Barclays DOJ Statement and the Barclays FSA Final Notice refer to Barclays Bank PLC. The Barclays CFTC Order refers to that entity as well as Barclays PLC and Barclays Capital Inc. Additionally, the Barclays DOJ Statement notes "[t]he parties agree" that the information in it "is true and accurate."  *Id.* at 1.  It further states "Barclays acknowledges that the wrongful acts taken by the participating employees in furtherance of this misconduct set forth [in the Barclays DOJ Statement] were within the scope of their employment at Barclays" and that "the participating employees intended, at least in part, to benefit Barclays through the actions described [in the Barclays DOJ Statement]."  *Id.* ¶ 50.

[2] The agencies' findings concerning UBS are contained in:  (i) the DOJ's Statement of Facts in connection with its non-prosecution agreement with UBS ("UBS DOJ Statement"); (ii) the CFTC's Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act Making Findings and Imposing Remedial Sanctions ("UBS CFTC Order"); (iii) the FSA's Final Notice ("UBS FSA Final Notice"); and (iv) FINMA's Summary Report ("UBS FINMA Summary Report").

[3] The agencies' findings concerning RBS are contained in:  (i) the DOJ's Statement of Facts in connection with its deferred prosecution agreement with The Royal Bank of Scotland plc; (ii) the CFTC's Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act Making Findings and Imposing Remedial Sanctions ("RBS CFTC Order"); and (iii) the FSA's Final Notice.

1  Rabobank's misconduct in connection with the manipulation of, *inter alia*, U.S. Dollar LIBOR

2  and Yen-LIBOR;[4]

3      3.    Those sources, considered collectively, demonstrate that Panel Bank Defendants

4  systematically suppressed LIBOR during the Relevant Period, so that the interest rates or returns

5  on LIBOR-based financial instruments, including interest-rate swaps based on LIBOR, were

6  lower than they otherwise would have been absent Panel Bank Defendants' misconduct, thus

7  Plaintiff did not receive its rightful payments on those instruments.

8      4.    Except as alleged in this Complaint, neither Plaintiff nor other members of the

9  public have access to the underlying facts relating to Defendants' improper activities. Rather,

10  that information lies exclusively within the possession, custody, or control of Defendants and

11  other insiders, which prevents Plaintiff from further detailing Defendants' misconduct.

12  Moreover, numerous pending government investigations—both domestically and abroad,

13  including by the DOJ, the CFTC, and the SEC—concerning potential LIBOR manipulation could

14  yield additional information from Defendants' internal records or personnel that bears

15  significantly on Plaintiff's claims. Indeed, as one news report observed in detailing U.S.

16  regulators' ongoing investigation, "[i]nternal bank emails may prove to be key evidence . . .

17  because of the difficulty in proving that banks reported borrowing costs for Libor at one rate and

18  obtained funding at another."[5]  Plaintiff thus believes further evidentiary support for its

19  allegations will come to light after a reasonable opportunity for discovery.

20                          **<u>NATURE OF THE ACTION</u>**

21      5.    This case arises from the manipulation of LIBOR for the U.S. dollar ("USD-

22  LIBOR" or simply "LIBOR"),[6] the reference point for determining interest rates for trillions of

23  dollars in financial instruments, by a cadre of prominent financial institutions.

24  _____

25  [4] The agencies' findings concerning Rabobank are contained in:  (i) the DOJ's Statement of Facts in connection with its deferred prosecution agreement with Rabobank ("Rabobank DOJ Statement"); (ii) the CFTC's Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act

26  Making Findings and Imposing Remedial Sanctions ("Rabobank CFTC Order"); and (iii) the FCA's Final Notice ("Rabobank FCA Notice").

27  [5] David Enrich, Carrick Mollenkamp & Jean Eaglesham, "U.S. Libor Probe Includes BofA, Citi, UBS," *MarketWatch*, Mar. 17, 2011.

28  [6] While the term "LIBOR" generally encompasses rates with respect to numerous currencies (which are

1        6.        Throughout the Relevant Period, Panel Bank Defendants suppressed LIBOR

2   below the levels at which it would have been set had Panel Bank Defendants accurately reported

3   their borrowing costs to the BBA.  Plaintiff's allegations that Panel Bank Defendants suppressed

4   LIBOR are supported by (i) Panel Bank Defendants' powerful incentives to mask their true

5   borrowing costs to portray themselves as economically healthier than they actually were and to

6   reap unjustified revenues by setting artificially low interest rates on LIBOR-based financial

7   instruments Plaintiff and other investors obtained; (ii) independent analyses by consulting experts

8   retained by plaintiffs in the LIBOR MDL Proceedings showing (a) discrepancies between LIBOR

9   panel banks' daily individual quotes and the banks' probabilities of default (as measured by

10  Kamakura Risk Information Services) and (b) a discrepancy between LIBOR and the Federal

11  Reserve Eurodollar Deposit Rate; (iii) publicly available economic analyses, by prominent

12  academics and other commentators, of LIBOR's behavior during the Relevant Period compared

13  with other well-accepted, contemporaneous measures of Panel Bank Defendants' borrowing

14  costs, as well as the notable tendency of Panel Bank Defendants' daily submitted LIBOR quotes

15  to "bunch" near the bottom quartile of the collection of reported rates used to determine LIBOR;

16  and (iv) revelations in connection with the numerous domestic and foreign government

17  investigations into potential manipulation of USD-LIBOR and LIBOR for other currencies, most

18  prominently Yen-LIBOR.

19        7.        Among the facts that have emerged through government investigations,

20  settlements with Defendants Barclays, UBS, and The Royal Bank of Scotland—which

21  collectively obligate Barclays to pay more than $450 million, UBS to pay approximately $1.5

22  billion, and RBS to pay more than $600 million—include factual findings that (i) during the

23  "financial crisis period" of August or September 2007 through early 2009, Barclays, which in the

24  early part of that period had been submitting high quotes compared with the other LIBOR panel

25  banks, submitted artificially low LIBOR quotes to keep the company's submissions in line with

26  those of the other LIBOR panel banks so the market would not regard Barclays as financially

27

28  separately referred to as, for example, USD-LIBOR or Yen-LIBOR), for convenience Plaintiff uses the
    term "LIBOR" to reference USD-LIBOR.

worse off than its fellow banks; and (ii) from approximately August 9, 2007 to at least April 2009, UBS at times determined its submissions for U.S.-Dollar LIBOR and other rates by aiming to "err on the low side," or fall within "the middle of the pack," with respect to the quotes submitted by other LIBOR panel banks, in order to shield UBS against speculation concerning its financial stability during the widespread financial crisis.

8.      Those findings, which include *admissions* to the DOJ by Barclays and UBS, strongly support Plaintiff's allegations that Panel Bank Defendants attempted to, and did, suppress USD-LIBOR during the Relevant Period.

9.      The government investigations have also uncovered evidence of wrongdoing by Barclays, UBS, and RBS in attempting to manipulate, and actually manipulating, LIBOR for other currencies, including conspiring with other banks to do so.  For example, from about 2005 through 2007 and continuing occasionally through about 2009 (according to the DOJ and the CFTC),[7] individuals responsible for making Barclays' submissions to the BBA with respect to LIBOR and the Euro InterBank Offered Rate ("EURIBOR") "agreed to accommodate, and accommodated," the requests of traders of interest-rate derivatives at Barclays who stood to benefit if LIBOR or EURIBOR were set at particular levels, and sometimes conspired with other banks about setting those rates.

10.      Additionally, from as early as 2001 to as late as December 31, 2010, UBS attempted to, and at times did, manipulate Yen-LIBOR and LIBOR related to other currencies, EURIBOR, and, periodically, the Euroyen Tokyo InterBank Offered Rate ("Euroyen TIBOR") by submitting false quotes to the rate-setting entities and sometimes colluding with traders at other banks to benefit UBS's, or other banks', derivatives-trading positions.

11.      Furthermore, "[c]ommencing in at least mid-2006 and continuing through 2010, RBS made hundreds of attempts to manipulate Yen and Swiss Franc LIBOR and, on numerous occasions, made false LIBOR submissions to benefit its derivatives and money market trading positions."[8]  RBS at times also "aided and abetted other panel banks' attempts to manipulate

---

[7] The FSA's "Final Notice" issued in connection with its settlement with RBS defines the time period as between January 2005 and July 2008.

[8] RBS CFTC Order at 2.

1    those same rates."[9]  RBS sometimes "was successful in manipulating Yen and Swiss Franc

2    LIBOR."[10]

3        12.    As detailed below, further revelations concerning Panel Bank Defendants'

4    manipulation of LIBOR emerged in the months following the Barclays settlements, and

5    government investigators have indicated similar actions could be taken against other banks.

6        13.    Panel Bank Defendants' suppression of LIBOR during the Relevant Period

7    allowed them to pay unduly low interest rates to investors, including Plaintiff, on LIBOR-based

8    financial instruments sold during the Relevant Period.  Investors, who until at least March 2011

9    had no reason to suspect Panel Bank Defendants' knowing suppression of LIBOR, justifiably

10   believed the financial instruments they were purchasing derived from a rate that was based on

11   USD-LIBOR panel members' honest and reasonable assessments of their borrowing costs.  To

12   the contrary, Panel Bank Defendants—in the debt-instrument context, the borrowers—

13   surreptitiously bilked investors, the lenders, of their rightful rates of return on their investments,

14   reaping hundreds of millions, if not billions, of dollars in ill-gotten gains.  Moreover, by

15   understating their true borrowing costs, Panel Bank Defendants provided a false or misleading

16   impression of their financial strength to investors and the rest of the market.

17       14.    Panel Bank Defendants' manipulation depressed returns on various types of

18   financial instruments, including interest-rate swaps Plaintiff obtained during the Relevant

19   Period.[11]

20       15.    During the Relevant Period, Plaintiff entered into interest-rate swaps, with certain

21   Panel Bank Defendants and with other counterparties, that calculated payments to Plaintiff based

22   on LIBOR.

23       16.    Plaintiff now seeks relief under federal antitrust and RICO statutes, state statutory

24   law, and state common law, for the damages it suffered as a result of Defendants' misconduct.

25

26   _____

[9] *Id.*

27   [10] *Id.*

28   [11] Plaintiff includes in the definition of "LIBOR-based financial instruments" the interest-rate swaps it held
     that paid interest based on LIBOR.

1

## JURISDICTION AND VENUE

2      17.    **Jurisdiction**: The Court has jurisdiction over the subject matter of this action

3   under 28 U.S.C. §§ 1331 and 1332, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 &

4   26(a).  The Court may exercise supplemental jurisdiction, in accordance with 28 U.S.C. § 1367,

5   over Plaintiff's state-law claims.

6      18.    The Court has personal jurisdiction over all of Defendants by virtue of their

7   business activities in the United States, California, and this District.

8      19.    Venue is proper in the Northern District of California because each Defendant

9   transacted business in this District and a substantial part of the events or omissions giving rise to

10  Plaintiff's claims occurred in this District.  Defendants' unlawful conduct manipulated the prices

11  of LIBOR-based instruments in this District.

12     20.    **Intradistrict Assignment**: Pursuant to N.D. Cal. Civil L.R. 3-2(d), this case

13  should be assigned to the San Francisco or the Oakland Divisions because this action arose in

14  Alameda County.

## THE PARTIES

15

16  **Plaintiff**

17     21.    Plaintiff Bay Area Toll Authority ("BATA"), established in 1997 by the California

18  Legislature, is the public instrumentality responsible for the administration of all toll revenues

19  from state-owned toll bridges within the geographic jurisdiction of the Metropolitan

20  Transportation Commission, the transportation planning, coordinating and financing agency for

21  the nine-county San Francisco Bay Area.   BATA, which has offices in Oakland, California,

22  manages and invests revenues from all tolls levied on the seven state-owned Bay Area toll

23  bridges.  BATA has issued fixed interest rate and variable interest rate bonds payable from those

24  toll bridge revenues.  In connection with its issuance of variable interest rate toll bridge revenue

25  bonds, BATA has entered into interest-rate swap contracts under which payments to BATA were

26  tied to LIBOR.

27

28

**Panel Bank Defendants**

22.    Defendant Bank of America Corporation is a Delaware corporation headquartered in Charlotte, North Carolina.  Defendant Bank of America, N.A., a federally-chartered national banking association headquartered in Charlotte, North Carolina, is an indirect, wholly-owned subsidiary of Defendant Bank of America Corporation.  Defendants Bank of America Corporation and Bank of America, N.A. are referenced collectively in this Complaint as "Bank of America."

23.    Defendant Bank of Tokyo-Mitsubishi UFJ Ltd. ("Bank of Tokyo") is a Japanese company headquartered in Tokyo, Japan.

24.    Defendant Barclays Bank plc ("Barclays") is a British public limited company headquartered in London, England.

25.    Defendant Citigroup, Inc. is a Delaware corporation headquartered in New York, New York.  Defendant Citigroup Financial Products, Inc., is a wholly-owned subsidiary of Defendant Citigroup, Inc. and is headquartered in New York.  Defendant Citibank, N.A., a federally-chartered national banking association headquartered in New York, New York, is a wholly-owned subsidiary of Defendant Citigroup, Inc.  Defendants Citigroup, Inc.; Citigroup Financial Products, Inc.; and Citibank, N.A. are referenced collectively in this Complaint as "Citibank."

26.    Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") is a financial services provider headquartered in Utrecht, the Netherlands.

27.    Defendant Credit Suisse Group AG ("Credit Suisse") is a Swiss company headquartered in Zurich, Switzerland.

28.    Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany.

29.    Defendant HSBC Holdings plc is a British public limited company headquartered in London, England.  Defendant HSBC Bank plc, a British public limited company headquartered in London, England, is a wholly-owned subsidiary of Defendant HSBC Holdings plc.  Defendants

1    HSBC Holdings plc and HSBC Bank plc are referenced collectively in this Complaint as

2    "HSBC."

3         30.    Defendant JPMorgan Chase & Co. is a Delaware corporation headquartered in

4    New York, New York.  Defendant JPMorgan Chase Bank, National Association, a federally-

5    chartered national banking association headquartered in New York, New York, is a wholly-

6    owned subsidiary of Defendant JPMorgan Chase & Co.  Defendants JPMorgan Chase & Co. and

7    JPMorgan Chase Bank, National Association are referenced collectively in this Complaint as

8    "JPMorgan Chase."

9         31.    Defendant Lloyds Banking Group plc ("Lloyds") is a British public limited

10   company headquartered in London, England.  Defendant Lloyds was formed in 2009 through the

11   acquisition of Defendant HBOS plc ("HBOS"), a British banking and insurance company

12   headquartered in Edinburgh, Scotland, by Lloyds TSB Bank plc.

13        32.    Defendant Royal Bank of Canada ("RBC") is a Canadian company headquartered

14   in Toronto, Canada.

15        33.    Defendant The Norinchukin Bank ("Norinchukin") is a Japanese cooperative bank

16   headquartered in Tokyo, Japan.

17        34.    Defendant The Royal Bank of Scotland Group plc (as noted above, "RBS") is a

18   British public limited company headquartered in Edinburgh, Scotland.

19        35.    Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich,

20   Switzerland.

21        36.    Defendant Portigon AG was, during the Relevant Period, known as WestLB AG, a

22   German joint stock company headquartered in Düsseldorf, Germany.  The European Commission

23   approved a restructuring plan for WestLB AG on December 20, 2011, and WestLB AG became

24   Portigon AG on July 2, 2012.  Portigon AG states on its website, "The internationally operating

25   service provider Portigon is the same legal entity as the former WestLB."[12]  Defendant

26   Westdeutsche ImmobilienBank AG, a German company headquartered in Mainz, Germany, was

27   a wholly-owned subsidiary of WestLB AG during the Relevant Period and is now a wholly-

28   _____
[12] *See* http://www.portigon.com/cm/content/portigon/i/en/ueber-portigon/westlb-archiv.html.

1  owned subsidiary of Erste Abwicklungsanstalt, based in Düsseldorf.  Defendants Portigon AG

2  (f/k/a WestLB AG) and Westdeutsche ImmobilienBank AG are referenced collectively in this

3  Complaint as "WestLB."

4        37.    These Defendants were members of the BBA's USD-LIBOR panel during the

5  Relevant Period and are thus collectively referred to as Panel Bank Defendants in this Complaint.

6        38.    Plaintiff entered into interest-rate swaps with Bank of America, Citibank, and JP

7  Morgan Chase (collectively, "Contracting Defendants").

8              **British Bankers' Association Defendants**

9        39.    The BBA is a trade association based in the United Kingdom.  Throughout the

10  2000s, the BBA owned LIBOR.  The BBA is governed by a Board, which officially meets four

11  times per year, comprised of the BBA Chief Executive and Chief Executives of other Defendants.

12  Defendant BBA Enterprises Ltd. is a wholly owned subsidiary of the BBA located in London.  In

13  late 2009, the BBA incorporated a new legal subsidiary, Defendant BBA LIBOR Ltd., to govern

14  LIBOR.  Defendants BBA, BBA Enterprises Ltd. and BBA LIBOR Ltd. are referenced

15  collectively in this Complaint as "BBA."

16  **PANEL BANK DEFENDANTS SUPPRESSED LIBOR DURING THE RELEVANT
PERIOD**

17

18    **A.    Each Panel Bank Defendant's LIBOR Quotes Were Supposed to Correspond
          to the Cost at which the Bank Perceived It Could Borrow Funds in the
          Relevant Market, and Were to Be Submitted Without Reference to Other
          Panel Bank Defendants' Quotes.**

19

20        40.    Each business day, Thomson Reuters calculates LIBOR—a set of reference or

21  benchmark interest rates priced to different ranges of maturity, from overnight to one year—on

22  behalf of the BBA, which first began setting LIBOR on January 1, 1986.  During most of the

23  Relevant Period, the BBA established LIBOR based on the rates 16 major banks, including Panel

24  Bank Defendants, reported as their costs of borrowing; the banks informed the BBA of their costs

25  of borrowing funds at different maturity dates (e.g., one month, three months, six months).[13]

26

27  [13] On February 9, 2009, Société Générale replaced Defendant HBOS on the BBA's USD-LIBOR panel.  In
February 2011, in response to concerns about possible LIBOR manipulation, the BBA added four more
28  banks to the panel.  On August 1, 2011, Defendant WestLB, at its request, was removed from the panel.
The panel currently consists of 18 banks.

Specifically, every day, the banks responded to the BBA's question: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?"  The BBA discarded the upper four and lower four quotes and set LIBOR by calculating the mean value of the remaining middle eight quotes, known as an "inter-quartile" methodology.  Thomson Reuters then published LIBOR, also reporting the quotes on which the BBA based its LIBOR calculation.

41.    As "the primary benchmark for short term interest rates globally,"[14] LIBOR has occupied a crucial role in the operation of financial markets.  LIBOR is "intended to be a barometer to measure strain in money markets and is often a gauge of the market's expectation of future central bank interest rates."[15]

42.    Market participants commonly set the interest rate on floating-rate instruments as a spread against LIBOR (e.g., "LIBOR + [X] bps")[16] and use LIBOR as a basis to determine the correct rate of return on short-term fixed-rate instruments (by comparing the offered rate to LIBOR).  Additionally, the pricing and settlement of Eurodollar futures and options—the most actively traded interest-rate futures contracts on the Chicago Mercantile Exchange—are based on the three-month LIBOR.  LIBOR thus affects the pricing of trillions of dollars' worth of financial transactions, rendering it, in the BBA's own words, "the world's most important number."[17]

43.    Accordingly, it is well-established among market participants that, as *The Wall Street Journal* has observed, confidence in LIBOR "matters, because the rate system plays a vital role in the economy."[18]  Moreover, given the vast universe of financial instruments LIBOR

---

[14] http://www.bbalibor.com/bbalibor-explained/the-basics.

[15] UBS CFTC Order at 6.

[16] The term "bps" stands for basis points.  100 basis points equal 1%.

[17] BBA press release, "BBA LIBOR: the world's most important number now tweets daily," May 21, 2009, available at http://www.bbalibor.com/news-releases/bba-libor-the-worlds-most-important-number-now-tweets-daily.

[18] Carrick Mollenkamp and Mark Whitehouse, "Study Casts Doubt on Key Rate --- WSJ Analysis Suggests Banks May Have Reported Flawed Interest Data for Libor," *The Wall Street Journal*, May 29, 2008.

- 12 -

impacts, "even a small manipulation" of the rate "could potentially distort capital allocations all over the world."[19]

44.     Because a bank's LIBOR contributions "should correspond to the cost at which the bank perceives that it can borrow funds in the relevant market," a bank's LIBOR submissions "may be viewed as an indicator of a bank's creditworthiness."[20]  In that regard, "[i]f a bank's LIBOR contributions are relatively high, those submissions could suggest that the bank is paying more than others to borrow funds," thus the bank "could be perceived to be experiencing financial difficulties because lenders were charging higher rates to that bank."[21]

45.     The BBA mandates that "each Contributor Panel bank must submit its rate without reference to rates contributed by other Contributor Panel banks."[22]  According to an August 10, 2007 BBA press release, LIBOR "closely reflected the real rates of interest being used by the world's large banks, and it reflected the actual rates at which banks borrowed money from each other."[23]

46.     Despite the financial meltdown of 2007-2008, the LIBOR panel banks "were nonetheless required to adhere to the benchmark definition and criteria and submit rates based on their evaluation of the costs of borrowing unsecured funds in the interbank markets, namely, for LIBOR, the London interbank market."[24]  The definitions and criteria regarding LIBOR "did not permit panel banks to base their submissions, in whole or in part, on a bank's desire to avoid negative media attention or reputational harm."[25]

47.     Eschewing those obligations throughout the Relevant Period, Panel Bank Defendants betrayed investors' confidence in LIBOR, as these financial institutions suppressed LIBOR by underreporting to the BBA the actual interest rates at which the Defendant banks

---

[19] Rosa M. Abrantes-Metz and Albert D. Metz, "How Far Can Screens Go in Distinguishing Explicit from Tacit Collusion?  New Evidence from the Libor Setting," *CPI Antitrust Chronicle*, Mar. 2012.
[20] UBS DOJ Statement ¶ 99.
[21] *Id.*
[22] *Id.* ¶ 7.
[23] *Id.* ¶ 98.
[24] UBS CFTC Order at 42.
[25] *Id.*

1    expected they could borrow funds—i.e., their true costs of borrowing—on a daily basis.  The

2    BBA then relied on the false information Panel Bank Defendants provided to set LIBOR.  By

3    knowingly acting to understate their true borrowing costs, Panel Bank Defendants caused LIBOR

4    to be set artificially low.

5              **B.**        **Panel Bank Defendants Possessed Strong Motives to Suppress LIBOR.**

6              48.       Panel Bank Defendants each had substantial financial incentives to suppress

7    LIBOR.  First, Panel Bank Defendants were motivated, particularly given investors' serious

8    concerns over the stability of the market in the wake of the financial crisis that emerged in 2007,

9    to understate their borrowing costs and thus the level of risk associated with the banks.

10   Moreover, because no one bank would want to stand out as bearing a higher degree of risk than

11   its fellow banks, each Defendant shared a powerful incentive to collude with its co-Panel Bank

12   Defendants to ensure it was not the "odd man out."

13             49.       Second, by artificially suppressing LIBOR, Panel Bank Defendants paid lower

14   interest rates on LIBOR-based financial instruments they sold to or entered into with investors,

15   including Plaintiff, during the Relevant Period.  Illustrating Panel Bank Defendants' motive to

16   artificially depress LIBOR, in 2009 Citibank reported it would make $936 million in net interest

17   revenue if rates would fall by 25 bps per quarter over the next year and $1.935 billion if they fell

18   1% instantaneously.  JPMorgan Chase likewise reported significant exposure to interest rates in

19   2009:  The bank stated that if interest rates increased by 1%, it would lose over $500 million.

20   HSBC and Lloyds also estimated they would earn hundreds of millions of additional dollars in

21   2008-2009 in response to lower interest rates and would lose comparable amounts in response to

22   higher rates.  These banks collectively earned billions in net interest revenues during the Relevant

23   Period.

24             50.       Panel Bank Defendants thus possessed reputational and financial incentives to

25   manipulate LIBOR—which, as further detailed below, they did.

26

27

28

C.    **Independent Analyses by Consulting Experts Engaged by Plaintiffs in the LIBOR MDL Proceedings Demonstrate that Panel Bank Defendants Artificially Suppressed LIBOR During the Relevant Period.**

51.    Consulting experts engaged by plaintiffs in the coordinated LIBOR MDL Proceedings compared LIBOR with other recognized benchmarks for determining banks' borrowing costs.  Employing well-reasoned methodologies, these consultants provided analyses showing that Panel Bank Defendants artificially suppressed LIBOR during the Relevant Period, as LIBOR did not appropriately correspond with other measures of Panel Bank Defendants' borrowing costs.  Specifically, the consulting experts detailed (i) the difference between Panel Bank Defendants' respective LIBOR quotes and their probabilities of default (which measure the banks' respective levels of credit risk); and (ii) the spread between LIBOR and the Federal Reserve Eurodollar Deposit Rate.

1.    **An independent analysis showing the discrepancy between Panel Bank Defendants' LIBOR quotes and their respective probabilities of default demonstrates that LIBOR was suppressed during the Relevant Period.**

52.    Assessing the likelihood that LIBOR was suppressed during the Relevant Period, expert consultants retained by plaintiffs in the LIBOR MDL Proceedings compared USD-LIBOR panel members' quotes from 2007 through 2008 to the daily default probability estimates for each of those banks as determined, and updated daily for each maturity (term), by Kamakura Risk Information Services ("KRIS").[26]  The study focused on identifying any periods of severe discrepancy between each bank's probabilities of default ("PDs") and the LIBOR quotes the bank submitted to the BBA.

53.    The KRIS reduced-form model estimates each bank's default risk on a daily basis by analyzing each bank's equity and bond prices, accounting information, and general economic conditions, such as the level of interest rates, unemployment rates, inflation rates, etc.  On its website, KRIS states it "provides a full term structure of default for both corporate and sovereign

---

[26] KRIS did not have PDs for Defendants WestLB, Rabobank, or Norinchukin, because those companies were not publicly traded.  This PD analysis therefore does not include those banks.

credit names based upon a multiple models approach" and its default probabilities "are updated daily and cover more than 30,000 companies in 37 countries."[27]

54.    PD provides a measure of a bank's credit (default) risk exposure, essentially the likelihood that the bank will default within a specified time period.  PD can be estimated using statistical models, whereas LIBOR is a rate of return required by investors lending short-term funds to the bank.  A finding of a statistically significant negative correlation coefficient between daily LIBOR quotes and PDs for a given bank over a given term period violates the fundamental relationship between risk and return:  Investors require a higher rate of return as a premium for taking on additional risk exposure, resulting in a positive relationship (correlation) between risk and return.  An increase in the bank's PD indicates that the risk of default has increased, thereby causing investors to require a higher rate of return for loans to the bank, which should correspond with a higher LIBOR quote.

55.    Accordingly, a finding of a statistically significant negative coefficient (of any size) between a bank's daily LIBOR quotes and its PDs shows that increases in PDs correspond with decreases in LIBOR quotes, which violates fundamental finance theory.  This would indicate that banks are suppressing their LIBOR quotes to avoid revealing the higher rates that reflect their true (higher) PDs.  In other words, any finding of negative, statistically significant correlation coefficients between a bank's PDs and its LIBOR quotes suggests LIBOR suppression by the bank over the analysis period.

56.    The magnitude of the correlation coefficient is impacted by the volatility of both PD and LIBOR for each bank during the time period.  Thus, for example, if a bank has high volatility in its PDs, the absolute value of the correlation coefficient will tend to be lower (i.e., less negative) as compared to an identical bank with low PD volatility.  However, both may be equally engaged in LIBOR suppression if their correlation coefficients are statistically significant and negative.

57.    The consulting experts used the KRIS database to test whether, for the period under study, each bank's daily sealed LIBOR quote correlated with the bank's estimated PD that

---

[27] *See* http://www.kris-online.com/.

day for the same maturity term (provided by KRIS).  For example, the consultants examined the correlation between Bank of America's sealed quote for three-month LIBOR on each date with the three-month PD for Bank of America, as provided by the KRIS database on that same day.  As explained above, standard finance theory implies that a positive correlation between a bank's PD and its LIBOR quote should exist—i.e., as the bank's default risk (PD) increases, its borrowing rate (LIBOR quote) should increase, and vice versa.  That is, using the above example, standard finance theory predicts a positive correlation between Bank of America's three-month PD and its three-month LIBOR quote.  A finding of either a zero or negative correlation between a bank's PD and its LIBOR quote indicates the latter does not reflect the bank's default-risk probability, which indicates LIBOR suppression.  A negative correlation means the two values have an inverse relationship; as one goes up, the other tends to go down.  A statistically significant negative correlation between a bank's LIBOR quote and its PD is consistent with the bank's reducing its LIBOR quote in order to mask its higher risk exposure during a period of financial crisis, such as during the 2007-2008 period.  By submitting an artificially low LIBOR quote, the bank sends a false signal that it is less risky than it truly is.

58.     The consulting experts found suppression over the 2007-2008 period for one-month, three-month, six-month, and 12-month LIBOR.

59.     The LIBOR quotes for all the reporting banks (except HSBC) during 2007 were negatively correlated with their daily updated PDs (for the same maturity term) to a statistically significant degree.  For example, the correlation between Bank of America's daily LIBOR quotes and its daily PDs was negative and statistically significant at a very high level for the one-month, three-month, six-month, and 12-month terms, i.e., between -0.5857 and -0.6093.[28]  In other words, the data indicate that, contrary to finance theory, the higher a panel bank's PD, the lower its LIBOR quote.

60.     Performing the same analysis with respect to the LIBOR panel banks' daily LIBOR quotes and PDs during 2008, the expert consultants found that for all of the banks, the

---

[28] Correlation coefficients range from a value of -1 to 1.  A correlation coefficient of -0.50, for example, would imply that a 1% increase in PD would result in a 50-basis point decline in the bank's LIBOR quote.

submitted LIBOR quotes were negatively correlated with their PDs at the one-month and three-month maturities. Indeed, all of the banks were submitting unduly low LIBOR quotes at all maturities during the time period from August 9, 2007 until September 12, 2008, and, with only one exception, from September 15 through December 31, 2008 (the period following the Lehman bankruptcy).

61.    The following graphs illustrate the findings of this expert analysis—which demonstrates a striking negative correlation between USD-LIBOR panel banks' LIBOR quotes and PDs during 2007 and 2008, indicating they severely depressed LIBOR during that time.

**<u>Graph 1</u>**

**Correlation Coefficients
Between Each Bank's Daily LIBOR Bid and Probability of Default (PD)
One-Month Term**



(Note: PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

1

**<u>Graph 2</u>**

2

**Correlation Coefficients**

3

**Between Each Bank's Daily LIBOR Bid and Probability of Default (PD)
Three-Month Term**



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)





(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

**Graph 4**

**Correlation Coefficients**
**Between Each Bank's Daily LIBOR Bid and Probability of Default (PD)**
**Twelve-Month Term**



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

**Graph 5**

**Correlation Coefficients**
**Between Each Bank's Daily LIBOR Bid and Probability of Default (PD)**
**9 August 2007 – 12 September 2008 Period**



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

1

**Graph 6**

2

**Correlation Coefficients**
**Between Each Bank's Daily LIBOR Bid and Probability of Default (PD)**

3

**15 September 2008 – 31 December 2008 Period**



16

17

(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

18

19

      **2.**    **The discrepancy between LIBOR and the Federal Reserve Eurodollar**
               **Deposit Rate during the Relevant Period suggests Panel Bank**
               **Defendants collusively suppressed LIBOR.**

20

      62.     As demonstrated by the work of another independent consulting expert retained by

21

plaintiffs in the LIBOR MDL Proceedings, analysis of the Eurodollar market strongly supports

22

that Panel Bank Defendants suppressed their LIBOR quotes and colluded to suppress reported

23

LIBOR rates.  Moreover, this analysis further supports that Panel Bank Defendants colluded to

24

control the amount of suppression over the Relevant Period.

25

      63.     The U.S. Federal Reserve prepares and publishes Eurodollar deposit rates for

26

banks (the "Federal Reserve Eurodollar Deposit Rate").  These Eurodollar deposit rates are

27

analogous to LIBOR in that they reflect the rates at which banks in the London Eurodollar money

28

market lend U.S. dollars to one another, just as LIBOR is intended to reflect rates at which panel

banks in the London interbank market lend U.S. dollars to one another. The Federal Reserve obtains its data from Bloomberg and the ICAP brokerage company.[29]  The Bloomberg Eurodollar deposit rate is similar to BBA's LIBOR except that the sampling is not limited to the 16 banks (during the Relevant Period) chosen by the BBA.  ICAP is a large broker-dealer in London in Eurodollar deposits.[30]  ICAP surveys its client banks and updates its Eurodollar deposit rates at about 9:30 AM each morning.

64.    While Panel Bank Defendants could have access to the ICAP Eurodollar deposit rates prior to submitting their individual LIBOR quotes at 11:00 each day, they would not—absent collusion—have access to other bank LIBOR quotes, which are confidential until submitted.  Thus, even within the context of a suppressed LIBOR, absent collusion, individual panel banks would not know what quote other panel banks intended to submit relative to the Federal Reserve Eurodollar Deposit Rate.

65.    The consulting expert determined that because of the nature of the relationship between the Federal Reserve Eurodollar Deposit Rate and LIBOR (detailed below), it would be unusual even for one bank to submit a LIBOR bid below the Federal Reserve's Eurodollar Deposit Rate.  For all Panel Bank Defendants to submit bids below the Federal Reserve Eurodollar Deposit Rate would be extremely unusual, and strongly supports evidence of collusion among the banks.

66.    Economic and statistical analysis strongly supports the use of the Federal Reserve Eurodollar Deposit rate as a benchmark for measuring the validity of LIBOR as reported by the panel banks.  To measure how well the Federal Reserve Eurodollar Deposit Rate and LIBOR move together, for the purposes of this analysis, the difference between the two rates, the

---

[29] *See* http://federalreserve.gov/releases/h15/data.htm, footnote 8.

[30] "ICAP is the world's premier voice and electronic interdealer broker and the source of global market information and commentary for professionals in the international financial markets. The group is active in the wholesale markets in interest rates, credit, energy, foreign exchange and equity derivatives. ICAP has an average daily transaction volume in excess of $1.5 trillion, more than 60% of which is electronic. ICAP plc was added to the FTSE 100 Index on 30 June 2006. For more information go to www.icap.com." *See* http://www.icapenergy.com/company/.

"Spread," is calculated as follows:  Spread = BBA LIBOR – Federal Reserve Eurodollar Deposit Rate.

67.    Since both LIBOR and the Federal Reserve Eurodollar Deposit Rate measure the lending cost to banks of Eurodollar deposits, important market and financial fundamentals, such as day-to-day changes in monetary policy, market risk and interest rates, as well as risk factors facing the banks generally (collectively "Market Fundamentals"), should be reflected similarly on both variables, and therefore should not affect the Spread.  The BBA's LIBOR panel is intended to reflect the Eurodollar deposit market in London.  By focusing on the Spread, the model therefore should be able to factor out normal and expected co-movements in banks' LIBOR quotes that arise from changes in Market Fundamentals.

68.    To analyze how well the Federal Reserve Eurodollar Deposit Rate captures changes in Market Fundamentals and absorbs variations in LIBOR that are driven by such fundamentals, consulting experts used regression analysis to measure the day-to-day changes in the Spread against changes in the T-Bill rate and the commercial paper rate.  The evidence from these regressions strongly supports that day-to-day changes in the Federal Reserve Eurodollar Deposit Rate effectively capture day-to-day movements in LIBOR caused by Market Fundamentals.  Thus, once the Federal Reserve Eurodollar Deposit Rate is subtracted to arrive at the Spread, remaining movements in LIBOR reflected in the Spread would be unrelated to movements in Market Fundamentals.

69.    Because Market Fundamentals are fully captured by the Spread, absent manipulation, the Spread should always be zero or close to zero.  Thus, as more fully discussed below, negative Spreads provide a strong basis to conclude that Panel Bank Defendants suppressed and colluded to artificially suppress LIBOR.[31]

70.    Figures 1 and 2 show the relationship between LIBOR, the Federal Reserve Eurodollar Deposit Rate, and the Spread beginning in 2000 and ending in mid 2012.  As can be

---

[31] It is important to note that to the extent panel banks submitting LIBOR quotes submit suppressed rates to the BBA, and these suppressed rates are also considered by Bloomberg or ICAP, then the resultant Federal Reserve Eurodollar Deposit rate would also be understated by the same suppression. Consequently, the Spread computed above could even understate the true magnitude of the suppression.

seen, between January 5, 2000 and around August 7, 2007, Federal Reserve's Eurodollar Deposit Rate tracked LIBOR very closely and the Spread remained positive and very close to zero. This finding indicates that the Spread effectively captures shared risks of the banks sampled by BBA and by Bloomberg and ICAP. The validity of this finding is bolstered by the fact that the Spread remained very close to zero in the face of multiple major financial dislocations, including the bursting of the dot-com bubble in 2000, the terrorist attacks of September 2001, and the 2001 U.S. economic recession. Likewise, the unusual downward movements in the Spread starting in August 2007 strongly evidences that LIBOR was being manipulated and suppressed during this period.[32]



Figure 1: LIBOR and Federal Reserve Eurodollar Deposit Rate

---

[32] The Spread only became consistently positive around the end of October 2011, just after the European Commission raided banks in connection with LIBOR.



**Figure 2: LIBOR and Federal Reserve Eurodollar Deposit Rate**

71. Figure 3 shows the Spread between 3-month maturity BBA LIBOR and the Federal Reserve Eurodollar Deposit rate (3-month maturity BBA LIBOR – Federal Reserve Eurodollar Deposit rate), from January 2006 through early April 2012.



Figure 3: BBA LIBOR - Federal Reserve Eurodollar Spread in Percentage Points

72.    The shorter period between January 3, 2006 and August 7, 2007 demonstrated above contains 393 trading days.  In this sub-period, there were only 3 days when the Spread was negative.  Furthermore, the magnitudes of these negative Spreads were also very small, equaling -0.9 basis point on June 14, 2006, -0.5 basis point on July 27, 2006 and -0.2 basis point on November 2, 2006.[33]  This finding again strongly supports that the Federal Reserve Eurodollar Deposit Rate serves as a good benchmark to control for Market Fundamentals that determine LIBOR.  The average magnitude of the Spread during this period equaled less than one basis point.   This finding also strongly supports that the risks of the banks sampled by BBA and Bloomberg and ICAP were similar.

73.    By August 2007, however, the Spread began to move into negative territory. During the early part of August 2007, the Federal Reserve Eurodollar Deposit Rate stayed around

---

[33]  One basis point is one-hundredth of a percentage point.

5.36%.  On August 8, the Federal Reserve Eurodollar Deposit Rate increased by 5 basis points to 5.41%, while BBA LIBOR did not keep pace.  The Spread turned negative 3 basis points on August 8, 2007.  The Spread remained mostly negative after August 7 so that by August 15, 2007, the trailing 10-day moving-average of the Spread also turned negative.  By August 31, 2007, the Federal Reserve Eurodollar Deposit rate kept increasing to 5.78%, while LIBOR was lagging. The negative Spread on August 31 grew to -16 basis points.

74. The Spread remained negative over the next year.  Between August 31, 2007 and September 15, 2008, the Spread remained negative on 234 of the 255 days, or 91.7% of the days. The magnitude of the negative Spread averaged about -12 basis points.  During this approximately one year period, the negative Spread exceeded -25 basis points on 18 days.

75. A big shock to LIBOR (and the Spread) came just after Lehman Brothers filed for bankruptcy on September 15, 2008, leading to significantly increased concerns about the health of all banks.  The increased concerns about the health of the banks were reflected in substantial increases in the Federal Reserve Eurodollar Deposit Rate.  On September 15, 2008, the Federal Reserve Eurodollar Deposit Rate equaled 3.0%, increasing to 3.2%, 3.75%, and 5% on September 16, 17 and 18, respectively.  By September 30, the Federal Reserve Eurodollar Deposit Rate doubled to 6%.

76. In spite of increased risks and worries about the banks after the Lehman bankruptcy filing, LIBOR did not keep pace with the Federal Reserve Eurodollar Deposit Rate during this period of heightened concerns, causing the Spread to become more negative.  On September 16, 2008, the negative Spread nearly doubled to -32 basis points.  The next day, on September 17, the negative Spread doubled again, reaching -69 basis points.  On September 18, the negative Spread more than doubled once again, reaching -180 basis points.  Finally, on September 30, 2008, the negative Spread reached -195 basis points.

77. Thus, between September 15, 2008 and September 30, 2008, the Federal Reserve Eurodollar Deposit Rate increased by 300 basis points to reflect increasing concerns about the banks, while LIBOR increased by  less than one-half, or by 123 basis points during the same period.  This diversion in the behavior of the two rates strongly supports the finding that Panel

1    Bank Defendants intensified their collusive suppression of the LIBOR, and did so to understate

2    their borrowing costs in the face of increasing concerns about the health of the banks.

3         78.    The Spread remained negative for more than one and a half years following the

4    Lehman filing, until May 17, 2010.  As concerns about banks' financial health eased, so did the

5    magnitude of the suppression of LIBOR.  As stated earlier, Federal Reserve's Eurodollar Deposit

6    Rate reached 6% on September 30, 2008.  With the easing of the financial crisis, Federal

7    Reserve's Eurodollar Deposit Rate fell to 0.45% on May 17, 2010.  The average suppression of

8    the LIBOR rate between October 1, 2008 and May 17, 2010 equaled negative 38 basis points.

9    The Spread finally turned positive for the first time during the post-Lehman period on May 17,

10   2010.  Following this date, the Spread again became negative, with the magnitude of the Spread

11   averaging around -10 basis points.  The dramatic period of negative Spread during the Relevant

12   Period, following years of uniform behavior between each individual Defendant Bank's LIBOR

13   quote and the Federal Reserve Eurodollar Deposit Rate, is also graphically demonstrated by

14   Figures 4 to 19 below on a bank by bank basis. Every Spread during the period August 8, 2007 to

15   May 17, 2010 is statistically significant at the extremely high 99% confidence level.

16

17

18

19

20

21

22

23

24

25

26

27

28





Figure 5: JPMorganChase LIBOR - Federal Reserve Eurodollar Spread in Percentage Points



Figure 6: Barclays LIBOR - Federal Reserve Eurodollar Spread in Percentage Points



Figure 7: Deutsche Bank LIBOR - Federal Reserve Eurodollar Spread in Percentage Points



Figure 8: Lloyds LIBOR - Federal Reserve Eurodollar Spread in Percentage Points

COMPLAINT
CASE NO. C 14-01493









1
2
3
4
5
6
7
8
9
10
11
12
13



14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







1
2
3
4
5
6
7
8
9
10
11
12
13



14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10
11
12
13
14



Figure 19: HBOS LIBOR - Federal Reserve Eurodollar Spread in Percentage Points

15    79.    As the following chart demonstrates, the average Spread for each of the individual

16  Panel Bank Defendants was uniformly negative throughout the entire Relevant Period, strongly

17  supporting that each of these banks was suppressing its LIBOR quotes, and colluding to suppress

18  reported LIBOR rates.

19
20
21
22
23
24
25
26
27
28

| **Bank Name** | **Average Spread between August 8, 2007 through May 17, 2010** |
|---|---|
| 1. Bank of Tokyo-Mitsb. | -25 basis points |
| 2. Bank of America | -30 basis points |
| 3. Barclays | -25 basis points |
| 4. Citi | -32 basis points |
| 5. CSFB | -27 basis points |
| 6. Deutsche Bank | -31 basis points |

| Bank Name | Average Spread between August 8, 2007 through May 17, 2010 |
|---|---|
| 7. HBOS | -29 basis points |
| 8. HSBC | -32 basis points |
| 9. JP Morgan Chase | -35 basis points |
| 10. Lloyds | -30 basis points |
| 11. Norin Bank | -25 basis points |
| 12. Rabo Bank | -32 basis points |
| 13. Royal Bank of Canada | -28 basis points |
| 14. Royal Bank of Scotland | -26 basis points |
| 15. UBS | -29 basis points |
| 16. West | -35 basis points |

80.    Moreover, as set forth in the following chart, during the critical two week period following the bankruptcy of Lehman Brothers, each of the Panel Bank Defendants dramatically increased its collusive suppression of LIBOR.

| Bank Name | Average Spread between September 16, 2008 and September 30, 2008 |
|---|---|
| 1. Bank of Tokyo-Mitsb. | -120 basis points |
| 2. Bank of America | -144 basis points |
| 3. Barclays | -87 basis points |
| 4. Citi | -142 basis points |
| 5. CS | -122 basis points |
| 6. Deutsche Bank | -129 basis points |
| 7. HBOS | -110 basis points |

| **Bank Name** | **Average Spread between September 16, 2008 and September 30, 2008** |
|---|---|
| 8. HSBC | -141 basis points |
| 9. JP Morgan Chase | -153 basis points |
| 10. Lloyds | -146 basis points |
| 11. Norin Bank | -126 basis points |
| 12. Rabo Bank | -143 basis points |
| 13. Royal Bank of Canada | -140 basis points |
| 14. Royal Bank of Scotland | -140 basis points |
| 15. UBS | -141 basis points |
| 16. West | -138 basis points |

81.     Every Spread during the period from September 16, 2008 to September 30, 2008 is statistically significant at the extremely high 99% confidence level.

82.     The consulting expert finds the results reflected in these two tables to be powerful and statistically significant evidence of Panel Bank Defendants' collusive suppression of LIBOR during the Relevant Period.

83.     As detailed above, analysis based on well accepted statistical methodologies strongly supports that suppression of LIBOR occurred during the Relevant Period, accomplished through the collusive conduct of Panel Bank Defendants.  The sustained period during which the Federal Reserve Eurodollar Deposit – LIBOR Spread fell and remained starkly negative, as seen in Figure 2 above, accounting as it does for Market Fundamentals, is not plausibly achievable absent collusion among Panel Bank Defendants.  The intensified suppression from September 16, 2008 to September 30, 2008 (following the Lehman bankruptcy), in defiance of economic expectations, provides further powerful support for the suppression of LIBOR achieved through collusion by Panel Bank Defendants.  Because no Panel Bank Defendant—absent collusive conduct—could know what LIBOR quote another panel bank actually intended to submit prior to

1    those numbers being made public after 11:00 in the morning, the fact that all Panel Bank

2    Defendants submitted LIBOR quotes below the Federal Reserve Eurodollar Deposit Rate over the

3    Relevant Period further strongly supports the participation of each Defendant Bank in the

4    suppressive and collusive scheme.

       **D.    Empirical Analyses by Academics and Other Commentators Further Indicate
5             LIBOR Suppression Occurred.**

6

7           84.    In addition to the independent expert work detailed above, publicly available

8    analyses by academics and other commentators collectively indicate LIBOR was artificially

9    suppressed during the Relevant Period.

              **1.    The discrepancy between Panel Bank Defendants' reported LIBOR
10                    quotes and their credit-default-swap spreads indicates the banks
                      misrepresented their borrowing costs to the BBA.**
11

12          85.    One economic indicator that Panel Bank Defendants suppressed USD-LIBOR

13   during the Relevant Period is the variance between their LIBOR quotes and their

14   contemporaneous cost of buying default insurance—i.e., a credit-default swap ("CDS")—on debt

15   they issued during that period.  A CDS, "the most common form of credit derivative, i.e., [a]

16   contract which transfers credit risk from a protection buyer to a credit protection seller,"[34]

17   constitutes an agreement by which one party, the protection buyer, seeks financial protection in

18   the event of a default on an underlying credit instrument (typically a bond or loan).  Typically, a

19   CDS buyer makes a series of payments (often referred to as the CDS "fee" or "spread") to the

20   CDS seller in exchange for a payment if the underlying credit instrument experiences an adverse

21   credit event.

22          86.    The spread serves as a measure of the perceived risk of default by the entity

23   issuing the underlying bond or receiving the loan—the greater the risk of default the underlying

24   bond or loan bears, the greater the CDS spread.  In the case of a CDS for which the underlying

25   instrument consists of an interbank loan where a USD-LIBOR panel bank is the borrower, the

26   greater the perceived risk the panel bank will default on the loan, the higher the applicable CDS

27

28   [34] *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 171-72 (2d Cir.
     2004) (alteration in original) (citation and internal quotation marks omitted).

1    spread, as this higher spread represents the cost of insuring against the increased risk of a default

2    on the underlying loan.

3          87.    As one commentator observed, "The cost of bank default insurance has generally

4    been positively correlated with LIBOR.  That is, in times when banks were thought to be healthy,

5    both the cost of bank insurance and LIBOR decreased or remained low, but when banks were

6    thought to be in poor condition, both increased."[35]  During the Relevant Period, however, those

7    historically-correlated indicia of banks' borrowing costs diverged significantly.

8          88.    That discrepancy was detailed in a May 29, 2008 *Wall Street Journal* article

9    reporting the results of a study it had commissioned.  The *Journal*'s analysis indicated numerous

10   banks caused LIBOR, "which is supposed to reflect the average rate at which banks lend to each

11   other," to "act as if the banking system was doing better than it was at critical junctures in the

12   financial crisis."[36]  The *Journal* found that beginning in January 2008, "the two measures began

13   to diverge, with reported LIBOR rates failing to reflect rising default-insurance costs."

14         89.    The *Journal* observed that the widest gaps existed with respect to the LIBOR

15   quotes of Defendants Citibank, WestLB, HBOS, JPMorgan Chase, and UBS.  According to the

16   *Journal*'s analysis, Citibank's LIBOR rates differed the most from what the CDS market

17   suggested the bank's borrowing cost was.  On average, the rates at which Citibank reported it

18   could borrow dollars for three months (i.e., its three-month LIBOR rates) were about 87 basis

19   points lower than the rates calculated using CDS data.  WestLB, HBOS, JPMorgan Chase, and

20   UBS likewise exhibited significant LIBOR-CDS discrepancies—of 70, 57, 43, and 42 basis

21   points, respectively—while Defendants Credit Suisse, Deutsche Bank, Barclays, HSBC, Lloyds,

22   and RBS each exhibited discrepancies of about 30 basis points.  The study's authors concluded

23   "one possible explanation for this gap is that banks understated their borrowing rates."

24         90.    The *Journal* further observed that on the afternoon of March 10, 2008, investors in

25   the CDS market were betting that WestLB—hit especially hard by the credit crisis—was nearly

26   ───────────────

[35] Justin Wong, "LIBOR Left in Limbo; A Call for More Reform," 13 *North Carolina Banking Institute*
27   365, 371 (2009) (footnotes omitted).

28   [36] *See* Carrick Mollenkamp and Mark Whitehouse, "Study Casts Doubt on Key Rate --- WSJ Analysis
     Suggests Banks May Have Reported Flawed Interest Data for Libor."

1    twice as likely to renege on its debts as Credit Suisse, perceived to be in better shape, was, yet the

2    next morning the two banks submitted identical LIBOR quotes.

3        91.    Additionally, having compared the banks' LIBOR quotes to their actual costs of

4    borrowing in the commercial-paper market, the *Journal* reported, for example, that in mid-April

5    2008, UBS paid 2.85% to borrow dollars for three months, but on April 16, 2008, the bank quoted

6    a borrowing cost of 2.73% to the BBA.

7        92.    The *Journal* further noted an uncanny equivalence between the LIBOR panel

8    banks' quotes:  the three-month borrowing rates the banks reported remained within a range of

9    only 0.06 of a percentage point, even though at the time their CDS insurance costs (premiums)

10   varied far more widely, reflecting the market's differing views as to the banks' creditworthiness.

11   According to Stanford University professor Darrell Duffie, with whom the authors of the *Journal*

12   article consulted, the unity of the banks' LIBOR quotes was "far too similar to be believed."

13       93.    David Juran, a statistics professor at Columbia University who reviewed the

14   *Journal*'s methodology, similarly concluded that the *Journal*'s calculations demonstrated "very

15   convincingly" that reported LIBOR rates were lower, to a statistically significant degree, than

16   what the market thought they should be.

17       94.    Calculating an alternate borrowing rate incorporating CDS spreads, the *Journal*

18   estimated that underreporting of LIBOR had a $45 billion effect on the market, representing the

19   amount borrowers (the banks) did not pay to lenders (investors in debt instruments) that they

20   would otherwise have had to pay.

21       95.    According to the *Journal*, three independent academics, including Professor

22   Duffie, reviewed its methodology and findings, at the paper's request.  All three deemed the

23   *Journal*'s approach "reasonable."

24       96.    Further economic analysis supports the correlation seen in the *Journal*'s report.

25   A study by Connan Snider and Thomas Youle of the economics departments at UCLA and the

26   University of Minnesota, respectively, released in April 2010 concluded that LIBOR did not

27   accurately reflect average bank borrowing costs, its "ostensible target."[37]  Noting that "[i]n a

28   _____
[37] Connan Snider and Thomas Youle, "Does the LIBOR reflect banks' borrowing costs?", Apr. 2, 2010.

competitive interbank lending market, banks' borrowing costs should be significantly related to their perceived credit risk," Snider and Youle posited that if LIBOR quotes "express true, competitively determined borrowing costs," they should "be related to measures of credit risks, such as the cost of default insurance." According to Snider and Youle's analysis, however, quotes provided by USD-LIBOR panel banks in fact deviated from their costs of borrowing as reflected in CDS spreads.

97.     Comparing, for example, the 12-month USD-LIBOR quotes from Citigroup and Bank of Tokyo together with the banks' respective one-year senior CDS spreads, Snider and Youle observed (as illustrated in the graph below) "that while Citigroup has a substantially higher CDS spread than [Bank of Tokyo], it submits a slightly lower Libor quote." Accordingly, the authors explain, while the CDS spreads "suggest that the market perceives Citigroup as riskier than [Bank of Tokyo], as it is more expensive to insure against the event of Citigroup's default," the banks' LIBOR quotes "tell the opposite story."



98.     Snider and Youle further noted the level of Citigroup's CDS spreads relative to its LIBOR quotes was "puzzling." The authors explained, "Given that purchasing credit protection for a loan makes the loan risk free, one would expect [the] difference between the loan rate and

1   the CDS spread to roughly equal the risk free rate.  This corresponds to the idea that a loan's

2   interest rate contains a credit premium, here measured by the CDS spread."  But the authors

3   observed that Citigroup's quote was often "significantly below its CDS spread," implying "there

4   were interbank lenders willing to lend to Citigroup at rates which, after purchasing credit

5   protection, would earn them *a guaranteed 5 percent loss*."  (Emphasis added).  That discrepancy

6   contravenes basic rules of economics and finance, thus indicating Citibank underreported its

7   borrowing costs to the BBA.

8               **2.    Cross-currency discrepancies in Panel Bank Defendants' LIBOR
                        quotes indicate they suppressed USD-LIBOR.**

9

10          99.     Panel Bank Defendants' LIBOR quotes also displayed inexplicable "cross-

11   currency rank reversals."  That is, as detailed in Snider and Youle's paper referenced above, at

12   least some Defendants reported lower rates on USD-LIBOR than did other panel members but,

13   for other currencies, provided higher rates than did those same fellow banks.  Both Bank of

14   America and Bank of Tokyo, for instance, quoted rates for USD-LIBOR and Yen-LIBOR during

15   the period under study, yet Bank of America quoted a lower rate than Bank of Tokyo for USD-

16   LIBOR and a higher rate than Bank of Tokyo for Yen-LIBOR.  Other Defendants included in

17   Snider and Youle's analysis—Barclays, Citigroup, and JPMorgan Chase—displayed similar

18   anomalies across currencies, as the graphs below illustrate.  Citigroup, for example, often

19   reported rates at the top of the Yen-LIBOR scale while simultaneously quoting rates at the bottom

20   of the USD-LIBOR scale.  Because, Snider and Youle explain, "the same bank is participating in

21   each currency," the credit risk "is the same for loans in either currency"; thus these "rank

22   reversals" demonstrate that differences in the banks' LIBOR quotes "are not primarily due to

23   differences in credit risk, something we would expect of their true borrowing costs."

24

25

26

27

28



### 3. The frequency with which at least certain Defendants' LIBOR quotes "bunched" around the fourth-lowest quote of the day suggests manipulation.

100.    During the Relevant Period, the rates reported by certain Defendants—in particular, Citibank, Bank of America, and JPMorgan Chase—also demonstrated suspicious "bunching" around the fourth-lowest quote submitted by the 16 banks to the BBA.  Indeed, Citibank's and Bank of America's quotes often tended to be identical to the fourth-lowest quote for the day.  Because the LIBOR calculation involved excluding the lowest (and highest) four reported quotes every day, bunching around the fourth-lowest quote suggests Panel Bank Defendants collectively depressed LIBOR by reporting the lowest possible rates that would not be excluded from the calculation of LIBOR on a given day.

101.    Bunching among Panel Bank Defendants' respective LIBOR quotes indicates the banks intended to report the same or similar rates, notwithstanding the banks' differing financial conditions, which, as detailed below, reasonably should have resulted in differing LIBOR quotes. Those discrepancies suggest Panel Bank Defendants colluded to suppress LIBOR.

1     102.    The following charts show the frequency with which the USD-LIBOR quotes

2    submitted by Panel Bank Defendants Citigroup, Bank of America, and JPMorgan Chase fell

3    within a given percentage rate from the fourth-lowest quote.  A negative difference means the

4    reporting bank was below the fourth-lowest quote, and therefore its rate was not included in the

5    daily LIBOR calculation, while zero difference means that the bank reported the fourth-lowest

6    quote on a given day (either by itself or tied with other reporting banks).[38]

7
8
9
10
11
12
13
14



15
16
17
18
19
20
21
22
23
24
25



26
27

28    [38] In the event of a tie between two or more banks, one of the banks' quotes, selected at random, was
discarded.

1
2
3
4
5
6
7
8
9
10
11



12    103.    According to Snider and Youle, the fact that bunching occurred around the pivotal

13    fourth-lowest reported rate reflects the reporting banks' intention to ensure the lowest borrowing

14    rates were included in the calculation of USD-LIBOR (which includes only the fifth-lowest

15    through the twelfth-lowest quotes).

16    104.    In other words, banks that bunched their quotes around the fourth-lowest

17    submission helped ensure the maximum downward manipulation of the resulting rate.

18    Furthermore, that a panel bank reported one of the four lowest quotes (i.e., quotes excluded from

19    the ultimate LIBOR calculation) does not mean the bank did not also participate in the collusion.

20    105.    Further demonstrating the aberrant nature of the bunching around the fourth-

21    lowest quote, Snider and Youle noted "the intraday distribution of *other* measures of bank

22    borrowing costs do not exhibit this bunching pattern."  (Emphasis added).

23    106.    Additionally, Snider and Youle detailed a discrepancy between USD-LIBOR panel

24    banks' LIBOR quotes and their CDS spreads, i.e., that "with the intra-day variation of both Libor

25    quotes and CDS spreads increasing from their historical levels," the CDS spreads' intra-day

26    variation "grew considerably larger than that of Libor quotes."[39]

27

28
_____
[39] Snider and Youle, "Does the LIBOR reflect banks' borrowing costs?"

107.    Snider and Youle further observed that—as the graphs below, embodying a composite of all the banks, illustrate—during the Relevant Period Panel Bank Defendants' quotes tended to "bunch" around the fourth-lowest quote much more commonly than those banks' CDS spreads "bunched" around the fourth-lowest spread.  The authors concluded, "If banks were truthfully quoting their costs, . . . we would expect these distributions to be similar."



108.    Given the method by which the BBA calculates LIBOR—discarding the highest and lowest reported rates and averaging the remainder—that strong concentration around the fourth-lowest rate is exactly what would occur if a number of banks sought in concert to depress LIBOR.

**4.    That LIBOR diverged from its historical relationship with the Federal Reserve auction rate indicates suppression occurred.**

109.    A comparison between LIBOR and the Federal Reserve auction rate further suggests Panel Bank Defendants artificially suppressed LIBOR during the Relevant Period.  An April 16, 2008 *Wall Street Journal* article, for example, noted the Federal Reserve had recently auctioned off $50 billion in one-month loans to banks for an average annualized interest rate of

2.82%—10 basis points higher than the comparable USD-LIBOR rate.  That differential would make no economic sense if the reported LIBOR rate was accurate, the *Journal* observed: "Because banks put up securities as collateral for the Fed loans, they should get them for a lower rate than Libor, which is riskier because it involves no collateral."

110.    A subsequent *Journal* article raised further concerns about LIBOR's accuracy based on the comparison of one-month LIBOR with the rate for the 28-day Federal Reserve auction.[40]  According to the *Journal*, because the Federal Reserve requires collateral:

> banks should be able to pay a lower interest rate [to the Fed] than they do when they borrow from each other [e.g., as ostensibly measured by LIBOR] because those loans are unsecured.  It is the same reason why rates for a mortgage, which is secured by a house, are lower than those for credit cards, where the borrower doesn't put up any collateral. In other words, the rate for the Fed auction should be lower than Libor.

To the contrary, though, two days before the *Journal* article (September 22, 2008), the rate for the 28-day Fed facility was 3.75%—much higher than one-month USD-LIBOR, which was 3.18% that day[41] and 3.21% the next day.

### 5.    LIBOR's divergence from its historical correlation to overnight index swaps also suggests it was artificially suppressed during the Relevant Period.

111.    Yet another measure of LIBOR's aberrant behavior with respect to other measures of banks' borrowing costs during the Relevant Period is its observed deviation from the overnight-index swap ("OIS") rate.  An academic article in the *North Carolina Banking Institute Journal* analyzing LIBOR data for the second half of 2007 and 2008 observed that between 2001 and July 2007, when the global credit crisis began, the spread between LIBOR and the OIS rate "averaged eleven basis points."[42]  By July 2008, on the other hand, that gap approached 100 basis points—a figure significantly higher than the spread from a year earlier—and by October 2008, "it peaked at 366 basis points."  While the spread "receded somewhat in November 2008 to 209

---

[40] Carrick Mollenkamp, "Libor's Accuracy Becomes Issue Again," *The Wall Street Journal*, Sept. 24, 2008.

[41] The *Journal* initially reported the one-month USD-LIBOR rate for that day as 3.19% but later noted the correct figure.

[42] Justin Wong, "LIBOR Left in Limbo; A Call for More Reform."

1   basis points," that was still "far above the pre-crisis level." That analysis indicates Panel Bank

2   Defendants suppressed LIBOR.

3       **6.**     **Additional data suggest LIBOR may have been manipulated as early**
        **as August 2006.**

4

5       112.     As the empirical evidence in support of LIBOR manipulation continues to

6   develop, at least some of the data point to possible manipulation as early as August 2006.  In a

7   2012 paper, Rosa Abrantes-Metz (of NYU Stern School of Business's Global Economics Group)

8   and Albert Metz (of Moody's Investors Service) compared one-month LIBOR against the Fed

9   Funds effective rate and the one-month Treasury Bill ("T-Bill") rate.[43]  Studying the period

10  spanning early August 2006 through early August 2007, the authors observed that the level of

11  one-month LIBOR was "virtually constant," while the Fed Funds effective rate and the one-

12  month T-Bill rate did "not present such striking stability."  Spurred by that "highly anomalous"

13  discrepancy, Abrantes-Metz and Metz examined the LIBOR panel members' individual quotes,

14  which showed that during the studied period, the middle eight quotes used to set LIBOR each day

15  were "essentially identical day in and day out"—another "highly anomalous" finding.

16      113.     The authors concluded that "explicit collusion" presented "the most likely

17  explanation" for this anomalous behavior.  They explained that because LIBOR quotes are

18  submitted sealed, "the likelihood of banks moving simultaneously to the same value from one day

19  to the next without explicit coordination is extremely low, particularly given that their

20  idiosyncrasies would not imply completely identical quotes under a non-cooperative outcome."

21  They further opined "it is difficult to attribute it to tacit collusion or strategic learning, since the

22  change is abrupt, the quotes are submitted sealed, and the quotes themselves sometimes change

23  from one day to the next in an identical fashion."

24      114.     Abrantes-Metz and Sofia B. Villas-Boas (of UC-Berkeley's Department of

25  Agricultural & Resource Economics) used another methodology—Benford second-digit reference

26  distribution—to track the daily one-month LIBOR rate over the period 2005-2008.[44]  Based on

---

[43] Rosa M. Abrantes-Metz and Albert D. Metz, "How Far Can Screens Go in Distinguishing Explicit from Tacit Collusion?  New Evidence from the Libor Setting."  *CPI Antitrust Chronicle*, vol. 1, Mar. 2012.

[44] Rosa M. Abrantes-Metz and Sofia B. Villas-Boas, "Tracking the Libor Rate," July 2010.

COMPLAINT
CASE NO. C 14-01493

1    this analysis, the authors found that for sustained periods in 2006 and 2007, the empirical

2    standard-deviation distribution differed significantly from the Benford reference distribution for

3    nearly all banks submitting quotes.  The authors also observed large deviations from Benford for

4    a sustained period in 2008.

5          115.    Those studies indicate at least a possibility that Panel Bank Defendants'

6    suppression of LIBOR goes back even farther than August 2007.

7    **E.    That At Least Some Defendants Faced Dire Financial Circumstances During the Relevant Period Further Renders Their Unduly Low LIBOR Quotes Striking.**

8

9          116.    The independent economic analyses performed in connection with the LIBOR

10   MDL Proceedings, whose findings are corroborated by the publicly available scholarly work

11   detailed above, strongly indicate Panel Bank Defendants' LIBOR quotes during the Relevant

12   Period did not appropriately reflect those banks' actual borrowing costs at that time—and, indeed,

13   that Panel Bank Defendants collectively suppressed LIBOR.  Further illustrating the striking

14   discrepancy between Panel Bank Defendants' submissions to the BBA and their actual borrowing

15   costs, during 2008 and 2009 at least some of those banks' LIBOR quotes were too low in light of

16   the dire financial circumstances the banks faced, which were described in numerous news articles

17   from the Relevant Period.

18   **1.    Citibank**

19         117.    On November 21, 2008, *The Wall Street Journal* reported that Citigroup

20   executives "began weighing the possibility of auctioning off pieces of the financial giant or even

21   selling the company outright" after the company faced a plunging stock price.  The article noted

22   Citigroup executives and directors "rushing to bolster the confidence of investors, clients and

23   employees" in response to uncertainty about Citigroup's exposure to risk concerning mortgage-

24   related holdings.[45]  Similarly, on November 24, 2008, *CNNMoney* observed:

25            If you combine opaque structured-finance products with current
              fair-value accounting rules, almost none of the big banks are
26            solvent because that system equates solvency with asset liquidity.
              So at this moment Citi isn't solvent. Some argue that liquidity, not
27            solvency, is the problem.  But in the end it doesn't matter.  Fear

28   ───────────────────
     [45] *See* http://online.wsj.com/article/SB122722907151946371.html?mod=testMod.

will drive illiquidity to such a point that Citi could be rendered insolvent under the current fair-value accounting system.[46]

118. On January 20, 2009, Bloomberg reported that Citigroup "posted an $8.29 billion fourth-quarter loss, completing its worst year, and plans to split in two under Chief Executive Officer Vikram Pandit's plan to rebuild a capital base eroded by the credit crisis. The article further stated, "The problems of Citi, Bank of America and others suggest the system is bankrupt." (Emphasis added).[47]

### 2. RBS, Lloyds, and HBOS

119. An April 23, 2008 analyst report from Société Générale reported, with respect to RBS's financial condition in the midst of its attempt to raise capital:

> Given the magnitude and change in direction in a mere eight weeks, we believe that management credibility has been tarnished. We also remain unconvinced that the capital being raised is in support of growth rather than merely to rebase and recapitalise a bank that overstretched itself at the wrong point in the cycle in its pursuit of an overpriced asset.

> \*       \*       \*

> [I]n our eyes, RBS has not presented a rock solid business case that warrants investor support and the bank has left itself almost no capital headroom to support further material deterioration in either its assets or its major operating environments. We believe £16bn (7% core tier I ratio) would have provided a solid capital buffer.

The analysts also opined, "[W]e are not of the belief that all of RBS'[s] problems are convincingly behind it." They further explained, "When faced with the facts and the events leading up to yesterday's request for a £12bn capital injection, we believe shareholders are being asked to invest further in order to address an expensive mishap in H2 07 rather than capitalise on growth opportunities."

120. On October 14, 2008, *Herald Scotland* reported a £37 billion injection of state capital into three leading banks, including RBS and HBOS. The article observed, "Without such near-nationalisations, . . . Royal Bank of Scotland and HBOS, would almost certainly have

---

[46] *See* http://money.cnn.com/2008/11/21/news/companies/benner_citi.fortune/.

[47] *See* http://www.bloomberg.com/apps/news?pid=21070001&sid=aS0yBnMR3USk.

1    suffered a run on their remaining reserves and been plunged into insolvency.  Their share prices

2    could scarcely have taken much more of their recent hammering."[48]

3          121.    On December 12, 2008, Bloomberg reported that shareholders approved HBOS's

4    takeover by Lloyds TSB Group plc following bad-loan charges in 2008 rising to £5 billion and an

5    increase in corporate delinquencies.  The article also quoted analysts characterizing HBOS's loan

6    portfolio as "'generally of a lower quality than its peers.'"  Bloomberg further observed that

7    HBOS suffered substantial losses on its bond investments, which totaled £2.2 billion, and losses

8    on investments increased from £100 million to £800 million for the year.[49]

9          122.    A January 20, 2009 analyst report from Société Générale stated:

10             We would note that given the 67% drop in the share price following
               [RBS]'s announcements yesterday [relating to capital restructuring
11             due to greater-than-expected credit-market related write downs and
               bad debt impairments in Q4], the loss of confidence in the bank's
12             ability to continue to operate as a private sector player and concern
               over the potential ineffectiveness of the Asset Protection Scheme
13             may prompt the UK government to fully nationalise the bank.  In
               this instance, the shares could have very limited value, if at all.[50]
14

15         123.    On March 9, 2009, Bloomberg reported that Lloyds "will cede control to the

16   British Government in return for state guarantees covering £260 billion ($572 billion of risky

17   assets)."  The article further observed that in September 2008, Lloyds agreed to buy HBOS for

18   roughly £7.5 billion as the British Government sought to prevent HBOS from collapsing after

19   credit markets froze.  The HBOS loan book was described as "more toxic than anyone ever

20   dreamed."[51]

21         124.    On November 24, 2009, Bloomberg reported that the Bank of England provided

22   £62 billion ($102 billion) of "taxpayer-backed emergency financing" to RBS and HBOS at the

23   height of the financial crisis in October 2008 and that "[t]he [financing] operations were kept

24

25   [48] *See* http://www.heraldscotland.com/reckless-banks-brought-this-financial-firestorm-down-upon-their-own-heads-1.891981.

26   [49] *See* http://www.bloomberg.com/apps/news?pid=newsarchive&sid=a4BTqdgwhPTc&refer=uk.

27   [50] *See* January 20, 2009 Société Générale analyst report on Royal Bank of Scotland titled "Little value left for shareholders."

28   [51] *See* http://www.businessday.com.au/business/lloyds-the-latest-uk-bank-to-be-rescued-20090308-8sfd.html.

1    secret until now to prevent unnerving markets." The Bank's Deputy Governor Paul Tucker was

2    quoted as stating in evidence to the Treasury Committee in London that "'[h]ad we not done it,

3    the cycle would have been a lot worse…[and that] [t]his was tough stuff, a classic lender of last

4    resort operation.'"[52]

5                    **3.    WestLB**

6        125.    A September 9, 2008 article in *Spiegel Online* reported WestLB was "heavily hit

7    as a result of the US sub-prime crisis and the resulting credit crunch. Ill-advised speculation

8    resulted in a 2007 loss of €1.6 billion—leading the bank to the very brink of insolvency." The

9    article reported that in early 2008, a special investment vehicle was set by WestLB's primary

10   shareholders to "guarantee €5 billion worth of risky investments." The European Commissioner

11   approved the public guarantee but demanded that the bank be "completely restructured to avoid

12   failing afoul of competition regulations." The European Commissioner for Competition later

13   warned that if WestLB did not significantly improve its restructuring package, Brussels would not

14   approve the public assistance that European Union had already provided to the bank. Further, if

15   that occurred, WestLB would have to pay back €12 billion to the EU.[53]

16       126.    On November 24, 2009, Bloomberg reported that BNP Paribas SA said

17   "[i]nvestors should buy the euro [ ] on speculation that capital will need to be repatriated to

18   support German bank WestLB AG." Furthermore, two German regional savings bank groups that

19   hold a majority stake in WestLB were "prepared to let the Dusseldorf-based lender become

20   insolvent" and that "the prospect of insolvency may force state-owned banks and savings banks

21   outside North Rhine-Westphalia, WestLB's home state, to contribute to capital injections."

22   Moreover, Bloomberg reported, WestLB needed "as much as 5 billion euros ($7.5 billion) in

23   capital and may be shut by Nov. 30 unless a solution for its capital needs can be found."[54]

24

25

26   [52] *See* http://www.bloomberg.com/apps/news?pid=21070001&sid=a9MjQj6MNTeA.

27   [53] *See* Anne Seith, Germany's WestLB under Attack from Brussels, *Spiegel Online*, Sept. 9, 2008, available at http://www.spiegel.de/international/business/0,1518,druck-577142,00.html.

28   [54] *See* Matthew Brown, BNP Says Buy Euro on Speculation WestLB to Be Rescued, Bloomberg, Nov. 24, 2009, available at http://www.bloomberg.com/apps/news?pid=21070001&sid=aI9ZPZShrjWI.

1    **F.    Defendants' Improper Activities Are the Focus of Government Investigations,**
**Legal Proceedings, and Disciplinary Actions Worldwide.**

2

3        127.    As detailed below, investigations regarding LIBOR are ongoing in the United

4    States, the United Kingdom, Switzerland, Japan, Canada, the European Union, and Singapore by

5    numerous government agencies, including the DOJ, the SEC, and the CFTC.

6        128.    Indeed, on February 27, 2012, the DOJ represented to the Court overseeing the

7    LIBOR MDL Proceedings that the Justice Department "is conducting a criminal investigation

8    into alleged manipulation of certain benchmark interest rates, including LIBORs of several

9    currencies."  The investigation consists of a joint effort by the DOJ's criminal and antitrust

10   divisions.

11       129.    Authorities are attempting to determine, among other things, "whether banks

12   whose funding costs were rising as the financial crisis intensified tried to mask that trend by

13   submitting artificially low readings of their daily borrowing costs."[55]  Though the proceedings are

14   ongoing, several Defendants have admitted that government entities—including the DOJ, the

15   SEC, and the CFTC—have targeted them in seeking information about potential misconduct.

16       130.    Moreover, documents submitted in connection with legal proceedings in Canada,

17   Singapore, and Japan reveal that at least certain Panel Bank Defendants underreported their

18   borrowing costs to artificially suppress Yen-LIBOR.

19       **1.    News reports and Panel Bank Defendants' regulatory filings indicate**
**U.S. government and foreign regulatory bodies are engaged in**
20   **expansive investigations of possible LIBOR manipulation.**

21       131.    The first public revelation regarding government investigations into possible

22   LIBOR manipulation occurred on March 15, 2011, when UBS disclosed in a Form 20-F (annual

23   report) filed with the SEC that the bank had "received subpoenas" from the SEC, the CFTC, and

24   the DOJ "in connection with investigations regarding submissions to the [BBA]."  UBS stated it

25   understood "that the investigations focus on whether there were improper attempts by UBS, either

26   acting on its own or together with others, to manipulate LIBOR rates at certain times."  The bank

27   further disclosed that it had "received an order to provide information to the Japan Financial

28   _____
[55] Enrich, Mollenkamp, & Eaglesham, "U.S. Libor Probe Includes BofA, Citi, UBS."

Supervisory Agency concerning similar matters."  UBS stated it was "conducting an internal review" and was "cooperating with the investigations."

132.    On March 16, 2011, the *Financial Times* reported that UBS, BAC, Citigroup, and Barclays received subpoenas from U.S. regulators "probing the setting of" USD-LIBOR "between 2006 and 2008."  The *Times* further noted investigators had "demanded information from" WestLB, and that the previous fall, "all 16 members of the committee that helped the [BBA] set the dollar Libor rate during 2006-08 received informal requests for information."[56]

133.    The same day, *MarketWatch* similarly reported "[m]ultiple U.S. and European banks, which provide borrowing costs to calculate Libor every day, have been contacted by investigators," including the DOJ, the SEC, and the CFTC.[57]

134.    The next day, Bloomberg reported that Barclays and Citigroup had received subpoenas from U.S. regulators and that Defendants WestLB, Lloyds, and BAC had been contacted by regulators.  The article specified BAC had received subpoenas from the SEC and the DOJ.[58]

135.    On March 23, 2011, Bloomberg revealed that Citigroup Inc., Deutsche Bank, BAC, and JPMorgan Chase were asked by U.S. regulators "to make employees available to testify as witnesses" in connection with the regulators' ongoing investigation.[59]

136.    The next day, the *Financial Times* reported that Defendant Barclays was "emerging as a key focus of the US and UK regulatory probe into alleged rigging of [LIBOR]."  According to the *Times*, investigators were "probing whether communications between the bank's traders and its treasury arm," which helps set LIBOR, "violated 'Chinese wall' rules that prevent information-sharing between different parts of the bank."  The *Times* further stated investigators

---

[56] Brooke Masters, Patrick Jenkins & Justin Baer, "Banks served subpoenas in Libor case," FT.com, available at http://www.ft.com/cms/s/0/52958d66-501f-11e0-9ad1-00144feab49a.html#axzz1sJNEDIiI.

[57] Carrick Mollenkamp and David Enrich, "Banks Probed in Libor Manipulation Case," *MarketWatch*, Mar. 16, 2011.

[58] Gavin Finch and Jon Menon, "Barclays, Citigroup Said to Be Subpoenaed in Libor Probe," Bloomberg, Mar. 17, 2011.

[59] Joshua Gallu and Donal Griffin, "Libor Probe Spurs Witness Call-up at Citigroup, Deutsche Bank," Bloomberg, Mar. 23, 2011.

1    were "said to be looking at whether there was any improper influence on Barclays' submissions"

2    during 2006-2008 for the BBA's daily survey used to set LIBOR.[60]

3         137.    Additional information regarding the regulatory probes emerged during the next

4    few months, including revelations about other banks' possible—or actual—misconduct.

5         138.    In an "Interim Management Statement" filed on April 27, 2011, for example,

6    Barclays stated it was "cooperating with" the investigations by the UK Financial Services

7    Authority, the CFTC, the SEC, and the DOJ "relating to certain past submissions made by

8    Barclays to the [BBA], which sets LIBOR rates."

9         139.    RBS similarly disclosed, in a Form 6-K filed with the SEC on May 6, 2011, the

10   bank was "co-operating with" the investigations being conducted by the CFTC, the SEC, and the

11   European Commission "into the submission of various LIBOR rates by relevant panel banks."

12        140.    Soon after, on May 16, 2011, Lloyds disclosed that it too "had received requests

13   for information as part of the Libor investigation and that it was co-operating with regulators,

14   including the [CFTC] and the European Commission."[61]  Britain's *Daily Telegraph* further

15   reported that Defendant HBOS, which merged with Lloyds TSB in January 2009 to form Lloyds

16   Banking Group, "was the main target given its near collapse in late 2008 as it lost access to

17   wholesale funding markets."

18        141.    On May 23, 2011, the *Telegraph* reported that the Federal Bureau of Investigation

19   ("FBI") was working with regulators in connection with the LIBOR investigations, and the FBI's

20   British counterpart, the Serious Fraud Office, "revealed it is also taking an active interest."

21        142.    In a Form 6-K filed with the SEC on July 26, 2011, UBS disclosed that it had

22   "been granted conditional leniency or conditional immunity from authorities in certain

23   jurisdictions, including the Antitrust Division of the DOJ, in connection with potential antitrust or

24   competition law violations related to submissions for Yen LIBOR and Euroyen TIBOR (Tokyo

25   Interbank Offered Rate)."  Accordingly, the company continued, it would "not be subject to

26   _____

27   [60] Brooke Masters and Megan Murphy, "Barclays at centre of Libor inquiry," FT.com, Mar. 24, 2011, available at http://www.ft.com/intl/cms/s/0/1c3228f6-5646-11e0-82aa-00144feab49a.html#axzz1sJNEDIiI.

28   [61] Harry Wilson, "Lloyds Banking Group in Libor investigation," *The Daily Telegraph*, May 17, 2011.

1    prosecutions, fines or other sanctions for antitrust or competition law violations in connection

2    with the matters [UBS] reported to those authorities, subject to [UBS's] continuing cooperation."

3    The conditional leniency UBS received derives from the Antitrust Criminal Penalties

4    Enhancement and Reform Act and the DOJ's Corporate Leniency Policy, under which the DOJ

5    only grants leniency to corporations reporting actual illegal activity.  UBS later disclosed (on

6    February 7, 2012) that the Swiss Competition Commission had granted the bank conditional

7    immunity regarding submissions for Yen-LIBOR, TIBOR, and Swiss-franc LIBOR.

8         143.    Similar to the other Defendants discussed above, HSBC, in an interim report filed

9    on August 1, 2011, disclosed that it and/or its subsidiaries had "received requests" from various

10   regulators to provide information and were "cooperating with their enquiries."

11        144.    On or about the same day, Barclays—which several months earlier had referenced

12   its "cooperation" with government entities investigating potential misconduct relating to

13   LIBOR—specified the investigations involved "submissions made by Barclays" and other

14   LIBOR panel members.  Barclays further stated it was engaged in discussions with those

15   authorities about potential resolution of these matters before proceedings are brought against the

16   bank.

17        145.    On September 7, 2011, the *Financial Times* reported that as part of their LIBOR

18   investigation, the DOJ and the CFTC—in assessing whether banks violated the Commodity

19   Exchange Act, which can result in criminal liability—were examining "whether traders placed

20   bets on future yen and dollar rates and colluded with bank treasury departments, who help set the

21   Libor index, to move the rates in their direction," as well as "whether some banks lowballed their

22   Libor submissions to make themselves appear stronger."[62]

23        146.    On October 19, 2011, *The Wall Street Journal* reported that the European

24   Commission "seized documents from several major banks" the previous day, "marking the

25   escalation of a worldwide law-enforcement probe" regarding the Euro Interbank Offered Rate, or

26   Euribor—a benchmark, set by more than 40 banks, used to determine interest rates on trillions of

27

28   [62] Brooke Masters and Kara Scannell, "Libor inquiry looks at criminal angle," FT.com, Sept. 7, 2011, available at http://www.ft.com/cms/s/0/c8ed4248-d962-11e0-b52f-00144feabdc0.html#axzz1sRxAdyPS.

1    euros' worth of euro-denominated loans and debt instruments.  The Euribor inquiry, the *Journal*

2    explained, constitutes "an offshoot" of the broader LIBOR investigation that had been ongoing

3    for more than a year.  According to the *Journal*, while the list of financial firms raided by the

4    European Commission was not available, people familiar with the situation had counted "a large

5    French bank and a large German bank" among the targets, and the coordinated raids "occurred in

6    London and other European cities."

7    147.    On October 31, 2011, the *Financial News* observed that "[a]n investigation into

8    price fixing, first ordered by the [SEC] in 2008, focused on whether banks, including UBS,

9    Citigroup, and Bank of America, had been quoting deliberately low rates."[63]

10    148.    On December 9, 2011, *Law360* reported that the Japanese Securities and Exchange

11    Surveillance Commission ("SESC") alleged that Citigroup Global Markets Japan Inc. and UBS

12    Securities Japan Ltd. "employed staffers who attempted to influence" TIBOR "to gain advantage

13    on derivative trades."  The SESC recommended that the Japanese prime minister and the head of

14    Japan's Financial Services Agency ("JFSA") take action against the companies.  The Commission

15    specified that Citigroup's head of G-10 rates and a Citigroup trader, as well as a UBS trader, were

16    involved in the misconduct, further stating, "[t]he actions of Director A and Trader B are

17    acknowledged to be seriously unjust and malicious, and could undermine the fairness of the

18    markets."  Moreover, the Commission added, "[i]n spite of recognizing these actions, the

19    president and CEO . . . who was also responsible for the G-10 rates, overlooked these actions and

20    the company did not take appropriate measures, therefore, the company's internal control system

21    is acknowledged to have a serious problem."[64]  *Law360* reported that the SESC released "a

22    similar statement" about UBS's alleged conduct.

23    149.    Citigroup and UBS did not deny the SESC's findings.  A Citigroup spokesperson

24    stated, "Citigroup Global Markets Japan takes the matter very seriously and sincerely apologizes

25    to clients and all parties concerned for the issues that led to the recommendation.  The company

26    has started working diligently to address the issues raised."  A UBS spokesperson similarly stated

27    _____

28    [63] Tom Osborn, "Is Libor in its death throes?", *Financial News*, Oct. 31, 2011.

[64] Juan Carlos Rodriguez, "Japan Accuses Citi, UBS Of Market Trickery," *Law360*, Dec. 9, 2011.

1    the bank was taking the findings "very seriously" and had been "working closely with" the SESC

2    and the JFSA "to ensure all issues are fully addressed and resolved."  She added, "We have taken

3    appropriate personnel action against the employee involved in the conduct at issue."

4         150.   Citigroup later disclosed that on December 16, 2011, the JFSA took administrative

5    action against Citigroup Global Markets Japan, Inc. ("CGMJ") for, among other things, certain

6    communications made by two CGMJ traders about Euroyen TIBOR.  The JFSA issued a business

7    improvement order and suspended CGMJ's trading in derivatives related to Yen-LIBOR, as well

8    as Euroyen and Yen-TIBOR from January 10 to January 23, 2012.  On the same day, the JFSA

9    also took administrative action against Citibank Japan Ltd. for conduct arising out of Citibank

10   Japan's retail business and also noted that the communications made by the CGMJ traders to

11   employees of Citibank Japan about Euroyen TIBOR had not been properly reported to Citibank

12   Japan's management team.

13        151.   UBS likewise revealed further details regarding the Japanese regulators' findings

14   and the resulting disciplinary action.  Specifically, the bank announced that on December 16,

15   2011, the JFSA commenced an administrative action against UBS Securities Japan Ltd. ("UBS

16   Securities Japan") based on findings by the SESC that:

17            (i) a trader of UBS Securities Japan engaged in inappropriate
              conduct relating to Euroyen TIBOR and Yen LIBOR, including
18            approaching UBS AG, Tokyo Branch, and other banks to ask them
              to submit TIBOR rates taking into account requests from the trader
19            for the purpose of benefiting trading positions; and (ii) serious
              problems in the internal controls of UBS Securities Japan resulted
20            in its failure to detect this conduct.

21   Based on those findings, the JFSA "issued a Business Suspension Order requiring UBS Securities

22   Japan to suspend trading in derivatives transactions related to Yen LIBOR and Euroyen TIBOR"

23   from January 10 to January 16, 2012 (excluding transactions required to perform existing

24   contracts).  The JFSA also issued a "Business Improvement Order" requiring UBS Securities

25   Japan to enhance "compliance with its legal and regulatory obligations" and to establish a

26   "control framework" designed to prevent similar improper conduct.

27        152.   *The Wall Street Journal* has since cited people familiar with the UBS matter as

28   identifying the trader as Thomas Hayes, who joined UBS Securities Japan in 2006 "and traded

1   products linked to the pricing of short-term yen-denominated borrowings"; he worked at UBS for

2   about three years.[65]

3        153.    In the same article, the *Journal* more broadly reported that investigators in the U.S.

4   and foreign LIBOR probes "are focusing on a small number of traders suspected of trying to

5   influence other bank employees to manipulate the rates."

6        154.    Other news accounts have confirmed—based at least in part on information from

7   people familiar with the ongoing investigations—that investigators are examining potential

8   improper collusion by traders and bankers to manipulate LIBOR or other rates.  On February 3,

9   2012, for instance, Credit Suisse disclosed that the Swiss Competition Commission commenced

10  an investigation involving twelve banks and certain other financial intermediaries, including

11  Credit Suisse, concerning alleged collusive behavior among traders to affect the bid ask spread

12  for derivatives tied to the LIBOR and TIBOR reference rates fixed with respect to certain

13  currencies, and collusive agreements to influence these rates.

14       155.    Additionally, on February 14, 2012, Bloomberg reported that two people with

15  knowledge of the ongoing LIBOR probe said global regulators "have exposed flaws in banks'

16  internal controls that may have allowed traders to manipulate interest rates around the world."

17  The same people, who were not identified by name (as they were not authorized to speak publicly

18  about those matters), stated investigators also had "received e-mail evidence of potential

19  collusion" between firms setting LIBOR.  Those sources further noted Britain's FSA was

20  "probing whether banks' proprietary-trading desks exploited information they had about the

21  direction of Libor to trade interest-rate derivatives, potentially defrauding their firms'

22  counterparties."[66]

23       156.    Bloomberg further reported that RBS had "dismissed at least four employees in

24  connection with the probes," and Citigroup and Deutsche Bank "also have dismissed, put on

25  leave or suspended traders as part of the investigations."

26  ---

27  [65] Jean Eaglesham, Atsuko Fukase, & Sam Holmes, "Rate Probe Keys On Traders: Investigators Suspect Employees at Some Banks Tried to Manipulate Rates," *The Wall Street Journal*, Feb. 7, 2012.

28  [66] Lindsay Fortado and Joshua Gallu, "Libor Probe Said to Expose Collusion, Lack of Internal Controls," Bloomberg, Feb. 14, 2012.

157.   Bloomberg also reported that European Union antitrust regulators are also investigating whether banks effectively formed a global cartel and coordinated how to report borrowing costs between 2006 and 2008.

158.   In March 2012, the Monetary Authority of Singapore disclosed that it has been approached by regulators in other countries to help in investigations over the possible manipulation of interbank interest rates.[67]

159.   According to the *Daily Mail*, investigations by the SEC, the FSA, the Swiss Competition Commission, and regulators in Japan focus on three concerns:  First, whether banks artificially suppressed LIBOR during the financial crisis, making banks appear more secure than they actually were; second, whether bankers setting LIBOR leaked their data to traders before officially submitting the banks' LIBOR quotes to the BBA; and third, whether traders at the banks, and at other organizations (such as hedge funds), may have tried to influence LIBOR by making suggestions or demands on the bankers providing LIBOR quotes.

### 2.   Evidence disclosed to date in proceedings in Canada and Singapore confirms that certain Defendants conspired to manipulate Yen-LIBOR.

160.   Documents submitted in pending legal proceedings in Canada and Singapore strongly indicate some Defendants manipulated Yen-LIBOR, the Yen-based rate set by a 15-member BBA panel that, during the Relevant Period consisted of (and still consists of) many of the same banks whose borrowing-cost quotes determine USD-LIBOR, including Barclays, Citibank, Deutsche Bank, HSBC, JPMorgan Chase, Lloyds, RBS, and UBS.  The facts (some provided by Panel Bank Defendants themselves) demonstrating Panel Bank Defendants' misconduct with respect to Yen-LIBOR illustrate both their desire and ability to manipulate interest rates, and the method by which they have done so.

### a.   Canadian Proceedings

161.   In the Canadian action, Brian Elliott, a Competition Law Officer in the Criminal Matters Branch of the Competition Bureau, submitted an affidavit in May 2011 (the "May 2011 Elliott Affidavit") in support of "an Ex Parte Application for Orders to Produce Records Pursuant

---

[67] *Business Times*, Mar. 9, 2012.

to Section 11 of the Competition Act and for Sealing Orders" in the Court of Ontario, Superior

Court of Justice, East Region.  Specifically, the May 2011 Elliott Affidavit sought orders

requiring HSBC Bank Canada, Royal Bank of Scotland N.V., Canada Branch, Deutsche Bank,

J.P. Morgan Bank Canada, and Citibank Canada (referenced collectively in the Affidavit as the

"Participant Banks") to produce documents in connection with an inquiry concerning whether

those banks conspired to "enhance unreasonably the price of interest rate derivatives from 2007 to

March 11, 2010; to prevent or lessen, unduly, competition in the purchase, sale or supply of

interest derivatives from 2007 to March 11, 2010; to restrain or injure competition unduly from

2007 to March 11, 2010; and to fix, maintain, increase or control the price for the supply of

interest rate derivatives from March 12, 2010 to June 25, 2010."

162.    The May 2011 Elliott Affidavit further states the Competition Bureau "became

aware of this matter" after one of the banks (referenced in the affidavit as the "Cooperating

Party") "approached the Bureau pursuant to the Immunity Program" and, in connection with that

bank's application for immunity, its counsel "orally proffered information on the Alleged

Offences" to officers of the Competition Bureau on numerous occasions in April and May 2011.

Furthermore, according to the Affidavit, counsel for the Cooperating Party "stated that they have

conducted an internal investigation of the Cooperating Party that included interviews of

employees of the Cooperating Party who had knowledge of or participated in the conduct in

question, as well as a review of relevant internal documents."  The Affidavit also notes that on

May 17, 2011, counsel for the Cooperating Party provided the Competition Bureau with

"electronic records," which Elliot "believe[s] to be records of some of the communications

involving the Cooperating Party that were read out as part of the orally proffered information by

counsel for the Cooperating Party."

163.    The Affidavit recounted that, the Cooperating Party's counsel, during the relevant

period the Participant Banks—at times "facilitated" by "Cash Brokers"—"entered into

agreements to submit artificially high or artificially low London Inter-Bank Offered Rate

('LIBOR') submissions in order to impact the Yen LIBOR interest rates published by the

[BBA]."  Those entities engaged in that misconduct to "adjust[] the prices of financial

1  instruments that use Yen LIBOR rates as a basis." The Affidavit further states the Cooperating

2  Party's counsel "indicated the Participant Banks submitted rates consistent with the agreements

3  and were able to move Yen LIBOR rates to the overall net benefit of the Participants."

4  164.  More specifically, counsel proffered that during the relevant period, the Participant

5  Banks "communicated with each other and through the Cash Brokers to form agreements to fix

6  the setting of Yen LIBOR," which "was done for the purpose of benefiting trading positions, held

7  by the Participant Banks, on IRDs [interest rate derivatives]." By manipulating Yen LIBOR, the

8  Affidavit continues, "the Participant Banks affected all IRDs that use Yen LIBOR as a basis for

9  their price." The misconduct was carried out "through e-mails and Bloomberg instant messages

10  between IRD traders at the Participant Banks and employees of Cash Brokers (who had influence

11  in the setting of Yen LIBOR rates)." The Affidavit details:

> IRD traders at the Participant Banks communicated with each other
> their desire to see a higher or lower Yen LIBOR to aid their trading
> position(s). These requests for changes in Yen LIBOR were often
> initiated by one trader and subsequently acknowledged by the trader
> to whom the communication was sent. The information provided
> by counsel for the Cooperating Party showed that the traders at
> Participant Banks would indicate their intention to, or that they had
> already done so, communicate internally to their colleagues who
> were involved in submitting rates for Yen LIBOR. The traders
> would then communicate to each other confirming that the agreed
> up rates were submitted. However, not all attempts to affect
> LIBOR submissions were successful.

> The Cash Brokers were asked by IRD traders at the Participant
> Banks to use their influence with Yen LIBOR submitters to affect
> what rates were submitted by other Yen LIBOR panel banks,
> including the Participant Banks.

21  165.  The Affidavit indicates the Cooperating Party's counsel further proffered that at

22  least one of the Cooperating Party's IRD traders ("Trader A" or "Trader B") communicated with

23  an IRD trader at HSBC, Deutsche Bank, RBS, JPMorgan (two traders), and Citibank. In that

24  regard, the Affidavit specifies:

> Trader A communicated his trading positions, his desire for a
> certain movement in Yen LIBOR and instructions for the HSBC
> trader to get HSBC to make Yen LIBOR submissions consistent
> with his wishes. Attempts through the HSBC trader to influence
> Yen LIBOR were not always successful. Trader A also
> communicated his desire for a certain movement in the Yen LIBOR
> rate with the Cash Brokers. He instructed them to influence the

Yen LIBOR submitters of HSBC.  The Cash Brokers acknowledged making these attempts.

Trader A communicated his trading positions, his desire for certain movement in Yen LIBOR and asked for the Deutsche IRD trader's assistance to get Deutsche to make Yen LIBOR submissions consistent with his wishes.  The Deutsche IRD trader also shared his trading positions with Trader A.  The Deutsche IRD trader acknowledged these requests.  Trader A also aligned his trading positions with the Deutsche IRD trader to align their interests in respect of Yen LIBOR.  The Deutsche IRD trader communicated with Trader A considerably during the period of time, mentioned previously, when Trader A told a Cash Broker of a plan involving the Cooperating Party, HSBC and Deutsche to change Yen LIBOR in a staggered and coordinated fashion by the Cooperating Party, HSBC and Deutsche.  Not all attempts to change the LIBOR rate were successful.

Trader A explained to RBS IRD trader who his collusive contacts were and how he had and was going to manipulate Yen LIBOR.  Trader A also communicated his trading positions, his desire for certain movement in Yen LIBOR and gave instructions for the RBS IRD trader to get RBS to make Yen LIBOR submissions consistent with Trader A's wishes.  The RBS IRD trader acknowledged these communications and confirmed that he would follow through.  Trader A and the RBS IRD trader also entered into transactions that aligned their trading interest in regards to Yen LIBOR.  Trader A also communicated to another RBS IRD trader his trading positions, his desire for a certain movement in Yen LIBOR and instructions to get RBS to make Yen LIBOR submissions consistent with his wishes.  The second RBS IRD trader agreed to do this.

Trader A communicated his trading positions, his desire for a certain movement in Yen LIBOR and gave instructions for them [two JPMorgan IRD traders] to get JPMorgan to make Yen LIBOR submissions consistent with his wishes.  Trader A also asked if the IRD traders at JPMorgan required certain Yen LIBOR submissions to aid their trading positions.  The JPMorgan IRD traders acknowledged these requests and said that they would act on them.  On another occasion, one of the JPMorgan IRD traders asked Trader A for a certain Yen LIBOR submission, which Trader A agreed to help with.  Trader A admitted to an IRD trader at RBS that he colluded with IRD traders at JPMorgan.

Trader B of the Cooperating Party communicated with an IRD trader at Citi.  They discussed their trading positions, advanced knowledge of Yen LIBOR submissions by their banks and others, and aligned their trading positions.  They also acknowledged efforts to get their banks to submit the rates they wanted.

166.    On May 18, 2011, the Ontario Superior Court signed the orders directing the production of the records sought by the May 2011 Elliott Affidavit.  But to Plaintiff's knowledge, the Affidavit was not publicly available until February 2012.

167.    Elliott submitted another affidavit in June 2011 (the "June 2011 Elliott Affidavit"), which sought an order requiring ICAP Capital Markets (Canada) Inc., believed to be one of the "Cash Brokers" referenced in the May 2011 Elliott Affidavit, to "produce records in the possession of its affiliates, ICAP PLC and ICAP New Zealand Ltd."  The June 2011 Elliott Affidavit primarily detailed communications between "Trader A" (an IRD trader) of the previously-referenced "Cooperating Party" and an ICAP broker (referenced in the June 2011 Elliott Affidavit as "Broker X") during the relevant period.

168.    The Affidavit specifies that Trader A "discussed his current trading positions with Broker X and where he would like to see various maturities of Yen LIBOR move."  Trader A "asked Broker X for Yen LIBOR submissions that were advantageous to Trader A's trading positions," and Broker X, in turn, "acknowledged these requests and advised Trader A about his efforts to make them happen."  The Affidavit further states:

> Counsel for the Cooperating Party has proffered that the expectation was for Broker X, directly or through other brokers at ICAP, to influence the Yen LIBOR submissions of Panel Banks. Broker X communicated to Trader A his efforts to get brokers at ICAP in London to influence Yen LIBOR Panel Banks in line with Trader A's requests.  The efforts of Broker X included contacting a broker at ICAP in London who issued daily LIBOR expectations to the market.  Trader A also communicated to Broker X his dealings with traders at other Participant Banks and a broker at another Cash Broker.  Not all efforts to influence Yen LIBOR panel banks were successful.  Broker X had additional discussions around the setting of Yen LIBOR with another trader of the Cooperating Party ("Trader B").

169.    On June 14, 2011, the Ontario Superior Court issued an order allowing the document requests concerning ICAP.

170.    The press has reported that UBS was the "Cooperating Party" referred to in the Elliott Affidavits.

### b.    Singapore Action

171.    In addition to UBS's admissions in the Canadian proceedings, in a pending legal action in Singapore's High Court, Tan Chi Min, former head of delta trading for RBS's global banking and markets division in Singapore (who worked for RBS from August 12, 2006 to November 9, 2011), alleges in his Writ of Summons and Statement of Claim that the bank condoned collusion between its traders and LIBOR rate-setters to set LIBOR at levels to maximize profits.  In the same filing, Min stated RBS commenced an internal probe following inquiries by European and U.S. authorities about potential LIBOR manipulation.

172.    Min—whom RBS terminated, asserting he engaged in "gross misconduct"—alleges that RBS's internal investigations "were intended to create the impression that such conduct was the conduct not of the defendant itself but the conduct of specific employees who the defendant has sought to make scapegoats through summary dismissals."  Min further alleges that it was "part of his responsibilities to provide input and submit requests to the rate setter and there is no regulation, policy, guideline or law that he has infringed in doing this," and that "it was common practice among [RBS]'s senior employees to make requests to [RBS]'s rate setters as to the appropriate LIBOR rate."  Those requests, Min specified, "were made by, among others, Neil Danziger, Jezri Mohideen (a senior manager), Robert Brennan (a senior manager), Kevin Liddy (a senior manager) and Jeremy Martin," and the practice "was known to other members of [RBS]'s senior management including Scott Nygaard, Todd Morakis and Lee Knight."  Min added that RBS employees "also took requests from clients (such as Brevan Howard) in relation to the fixing of LIBOR."

173.    Indeed, in responding to Min's allegations, RBS admitted he had tried to improperly influence RBS rate-setters from 2007 to 2011 to submit LIBOR rates at levels that would benefit him.

174.    In his complaint, however, Min alleged that he could not have influenced the rate on his own.  He also stated it was "common practice" among RBS's senior employees to make requests as to the appropriate LIBOR rate.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**G.**    **Facts Disclosed in Connection with Government Entities' Settlements with Barclays and UBS Further Demonstrate Defendants' Misconduct.**

**1.**    **The DOJ, CFTC, and FSA found that Barclays attempted to, and did, suppress LIBOR during the Relevant Period.**

175.    Findings made by the DOJ, CFTC, and FSA in connection with their investigations of Barclays' LIBOR-related misconduct illustrate that during the worldwide "financial crisis period" of August or September 2007 through early 2009, Barclays attempted to, and did, artificially suppress LIBOR to mask its true financial condition.

176.    The DOJ stated, "From approximately August 2007 through at least approximately January 2009, Barclays often submitted inaccurate Dollar LIBORs that under-reported its perception of its borrowing costs and its assessment of where its Dollar LIBOR submission should have been."[68]  Indeed, Barclays' submission of false LIBOR quotes was directed by "[c]ertain members of management at Barclays, including senior managers in the treasury department and managers of the money markets desk," who "directed that the Barclays Dollar LIBOR submitters contribute rates that were nearer to the expected rates of other Contributor Panel banks rather than submitting the proper, higher LIBORs."[69]

177.    The DOJ further observed, "[F]ollowing the direction from certain members of management," Barclays personnel who submitted LIBOR quotes "submitted rates that they believed would be consistent with the submissions of other Dollar LIBOR Contributor Panel banks, or at least, that would not be too far above the expected rates of other members of the Contributor Panel."[70]  Specifically, the DOJ found—based on "internal Barclays communications"—for certain time periods, "Barclays management instructed the Barclays Dollar LIBOR submitters not to be an 'outlier' compared to other Contributor Panel banks, even if Barclays contributed the highest rate; Barclays could be 'at the top of the pack' but not too far above the next highest contributor."[71]  The DOJ also found that while "certain managers"

---

[68] Barclays DOJ Statement ¶ 36.

[69] *Id.*

[70] *Id.*

[71] *Id.* ¶ 37.

1   believed that, in employing the approach detailed above, "Barclays's submitted rates typically

2   would be in the upper quartile of rates submitted by the Contributor Panel banks and thus

3   excluded from the rates used in the calculation of the LIBOR fix," at other times, "management

4   did not want Barclays to submit a rate higher than other Contributor Panel banks, and instructed

5   the Dollar LIBOR submitters to stay 'within the pack' of other members of the Dollar LIBOR

6   Contributor Panel, and to submit rates 'in line' with the other contributors."[72]

7         178.    The DOJ observed that on several occasions, "e-mail messages and phone

8   conversations involving a Barclays Dollar LIBOR submitter reflected the LIBOR submitter's

9   belief that, due to the pressure from Barclays management, Barclays was submitting its LIBOR

10  contributions lower than the rate at which Barclays was borrowing or could have borrowed funds,

11  and lower than the rate at which Barclays should have been submitting its LIBOR contributions,

12  and thus that submitter believed s/he was contributing a false rate."[73]  The DOJ's findings thus

13  demonstrate Barclays' *knowing misconduct* in submitting false LIBOR quotes to the BBA.

14        179.    In that regard, the CFTC specified, "Barclays knew that accounting for its

15  reputational risk in its determination of LIBOR submissions was not permissible under BBA's

16  definition and criteria."[74]  Barclays' LIBOR submitters and their supervisor nonetheless

17  "understood that they were to follow this directive regardless of market conditions or whether

18  their assessment of Barclays' cost of obtaining unsecured funds dictated their submissions to be

19  otherwise."[75]  In other words, "Barclays' U.S. Dollar LIBOR submitters knew that, by acting

20  upon senior management's instruction . . ., they were making improper U.S. Dollar LIBOR

21  submissions that were management's rates and not the rates that the submitters had determined

22  were the correct rates, *i.e.*, those that reflected Barclays' assessment of its cost of borrowing

23  unsecured funds in the London interbank money market."[76]

24

25  _____
    [72] *Id.*

26  [73] *Id.* ¶ 38.

27  [74] Barclays CFTC Order at 20.

28  [75] *Id.*

    [76] *Id.*

180.    The CFTC further found that the senior Barclays Treasury managers "frequently discussed with the U.S. Dollar LIBOR submitters and their supervisor the specific rates to be submitted, in order to ensure they were in compliance with the directive."[77]  During those discussions, "the senior U.S. Dollar LIBOR submitter consistently made clear that they were not setting Barclays' submissions at the rates that reflected Barclays' cost of obtaining unsecured funds."[78]  The CFTC observed that those discussions "were memorialized in multiple recorded telephone calls and emails during the more than 18-month financial crisis period."[79]

181.    On November 30, 2007, for example, a "senior Barclays Treasury manager" spoke with Barclays' "senior U.S. Dollar LIBOR submitter," who was "seeking guidance on his submissions."[80]  During that conversation, the senior Treasury manager "related his understanding that senior management had discussed the issue and directed them to continue to 'stick within the bounds[,] so no head above [the] parapet.'"[81]  The Treasury manager also told the LIBOR submitter "that they would have to deal with the settings, meaning how to make LIBOR submissions per this directive, on 'a day-to-day-basis.'"[82]

182.    The CFTC further recounted that in early December 2007, Barclays' senior U.S. Dollar LIBOR submitter "emailed his supervisor stating that he submitted Barclays' one month LIBOR at 5.30 percent, which was four basis points over the next highest submission and almost five basis points over the LIBOR fixing" but "was well below the 5.40 percent that Barclays was paying (*i.e.*, asking) to borrow funds in the market, and that 'given a free hand [he] would have set around 5.45%.'"[83]  The submitter continued, "'My worry is that we (both Barclays and the contributor bank panel) are being seen to be contributing patently false rates.  We are therefore

---

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.* at 21.

[81] *Id.* (alterations in original).

[82] *Id.*

[83] *Id.* at 22 (alteration in original).

1  being dishonest by definition and are at risk of damaging our reputation in the market and with

2  the regulators.'"[84]

3        183.    The CFTC found that Barclays' misconduct in knowingly submitting false LIBOR

4  quotes stemmed from its desire "to protect [its] reputation against what it believed were negative

5  and unfair media and market perceptions that Barclays had a liquidity problem based in part on its

6  high LIBOR submissions."[85]

7        184.    The DOJ similarly observed that Barclays' improper submissions "began in

8  approximately late August 2007," shortly after Barclays "twice drew on the Bank of England's

9  emergency liquidity facility (known as the 'window'), borrowing approximately £1.6 billion the

10  second time."[86]  The DOJ further explained:

11           News articles about the withdrawals in late August 2007 noted a
            decline in Barclays's share price and questioned Barclays's
12           liquidity position, while Barclays explained publicly that the visits
            to the window were due to technical glitches.  Meanwhile, because
13           of the onset of the financial crisis, there was diminished liquidity in
            funding markets, and Barclays set certain of its LIBOR submissions
14           relatively high compared to other Contributor Panel banks.  In early
            September 2007, Barclays received negative press coverage
15           concerning Barclays's high LIBOR submissions in Sterling, Euro,
            and Dollar.  A news article questioned Barclays's liquidity position,
16           in light of Barclays's high LIBOR submissions and its visits to the
            Bank of England's window, and noted that Barclays's share price
17           had fallen.[87]

18        185.    Senior managers at Barclays "expressed concern about the negative publicity."[88]

19  Managers on Barclays' money-markets desk and in its Treasury department "who gave the

20  instruction to submit lower LIBORs, which resulted in improperly low LIBOR submissions,"

21  aimed "to avoid inaccurate, negative attention about Barclays's financial health as a result of its

22  high LIBOR submissions relative to other banks."[89]  They "wanted to prevent any adverse

23  conclusions about Barclays's borrowing costs, and more generally, its financial condition,

---

24  [84] Id.

25  [85] Id. at 19.

26  [86] Barclays DOJ Statement ¶ 39.

27  [87] Id.

28  [88] Id. ¶ 40.

   [89] Id.

because they believed that those conclusions would be mistaken and that other Contributor Panel banks were submitting unrealistically low Dollar LIBORs."[90]

186.    Because those managers "sought to avoid what they believed would be an inaccurate perception that Barclays was not in good financial shape when compared to its peers," Barclays "engaged in this misconduct in order to reduce the reputational risk associated with proper, higher LIBOR submissions."[91]    In other words, the DOJ explained—borrowing from Barclays employees' comments in internal communications—"the purpose of the strategy of under-reporting Dollar LIBORs was to keep Barclays's 'head below the parapet' so that it did not get 'shot' off."[92]

187.    In that regard, the CFTC found, a Barclays senior compliance officer stated in an internal e-mail to several levels of Barclays' senior management that he had informed the FSA "that Barclays believed that LIBOR submissions by the panel banks were distorted due to market illiquidity; that Barclays had been consistently the highest or one of the two highest submitters but was concerned to go higher given the negative media reporting about Barclays; that Barclays had concerns about the trillions of dollars of derivatives fixed off LIBOR; and that there were 'problematic actions' by some banks."[93]    That senior compliance officer did not, however, inform the FSA "that Barclays was making its LIBOR submissions based on considerations of negative market or press perceptions of Barclays or that its LIBOR submitters' assessments of the appropriate rates for submission were being altered to adhere to the directive to be below 'the parapet.'"[94]

188.    On another occasion, following an April 16, 2008 *Wall Street Journal* article speculating "that panel member banks were making LIBOR submissions lower than what they were actually paying for funds to prevent the market from concluding that the banks were desperate for cash," a senior Barclays Treasury manager informed the BBA "that [Barclays] had

---

[90] *Id.*

[91] *Id.* ¶ 40.

[92] *Id.*

[93] Barclays CFTC Order at 22.

[94] *Id.*

1    not been reporting accurately," although he further noted "Barclays *was not the worst offender of*

2    *the panel bank members*."[95]   On that call, the Treasury manager stated, "We're clean, but we're

3    dirty-clean, rather than clean-clean."[96]   The BBA representative responded, "[N]o one's clean-

4    clean."[97]   The CFTC's findings accord with those by the FSA, which observed, "Barclays

5    believed that the submissions of other contributing banks were inappropriate during the financial

6    crisis."[98]

7        189.    The CFTC Order further specifies, "Senior Barclays Treasury managers provided

8    the submitters with the general guidance that Barclays' submitted rates should be within ten basis

9    points of the submissions by the other U.S. Dollar panel banks to be in compliance with the

10   directive."[99]

11       190.    Additionally, the DOJ Statement observes that while "the intent of the Barclays

12   managers who gave the instruction and the submitters who contributed improperly low rate

13   submissions in response to the instruction was to influence Barclays's benchmark interest rate

14   submissions" rather than the ultimate LIBOR levels, "[o]n some occasions, . . . the manipulation

15   of Barclays's submissions affected the fixed rates."[100]

16       191.    The DOJ also recounted Barclays' statements to regulators that other LIBOR Panel

17   Banks were submitting "false and dishonest" quotes to the BBA.

18       192.    The DOJ specified, "During approximately November 2007 through

19   approximately October 2008, certain employees at Barclays sometimes raised concerns with

20   individuals at the BBA, the [FSA], the Bank of England, and the Federal Reserve Bank of New

21   York concerning the diminished liquidity available in the market and their views that the Dollar

22   LIBOR fixes were too low and did not accurately reflect the market."[101]   Those employees, the

23

24   [95] *Id.* at 23 (emphasis added).

     [96] *Id.*

25   [97] *Id.*

26   [98] Barclays FSA Final Notice ¶ 117.

27   [99] Barclays CFTC Order at 20.

     [100] Barclays DOJ Statement ¶ 41.

28   [101] *Id.* ¶ 42.

DOJ found, "attempted to find a solution that would allow Barclays to submit honest rates without standing out from other members of the Contributor Panel, and they expressed the view that Barclays could achieve that goal *if other banks submitted honest rates*."[102]

193.   On November 29, 2007, for instance, "a Barclays manager ('Manager-1') contacted a representative of the BBA ('BBA Representative-1')" and stated "that Dollar 'LIBORs are being set lower than where they ought to be.'"[103]   "Manager-1" explained to "BBA Representative-1" that LIBOR Panel Banks were "submitting rates that are too low because 'banks are afraid to stock their heads above the parapet and post higher numbers because of what happened to [Barclays] when [Barclays] did.  You get shot at.'"[104]   "Manager-1," the DOJ further observed, "named certain other banks that s/he believed were submitting 1-month Dollar LIBORs lower than where those banks could get funds."[105]

194.   Additionally, the DOJ observed, "[o]n December 4, 2007, a Barclays LIBOR submitter sent an internal e-mail raising concerns about the Dollar LIBOR rates submitted by Contributor Panel Banks, including Barclays."[106]   The submitter "stated that s/he was submitting 1-month Dollar LIBOR lower than s/he was paying, and lower than s/he would have set if 'given a free hand.'"[107]   The submitter further stated "that s/he was worried that the Contributor Panel banks' submissions, including Barclays's, were false and dishonest."[108]

195.   The DOJ noted, however, Barclays' communications to regulators "were not intended and were not understood as disclosures through which Barclays self-reported misconduct to authorities."[109]   Indeed, following those communications, "Barclays continued improperly to take concerns about negative publicity into account when making its

---

[102] *Id.* (emphasis added).

[103] *Id.* ¶ 43.

[104] *Id.* (alterations in original).

[105] *Id.*

[106] *Id.* ¶ 45.

[107] *Id.*

[108] *Id.*

[109] *Id.* ¶ 42.

1    submissions."[110]  Moreover, the DOJ emphasized, "on other occasions, those employees did not

2    provide full and accurate information during their conversations with these external parties."[111]

3         196.    The findings by the CFTC and the FSA also indicate Barclays knew, when

4    determining the LIBOR quotes it would submit to the BBA on a given day—the quotes its fellow

5    LIBOR Panel Banks intended to submit.

6         197.    The FSA observed, for example, that on November 28, 2007, a LIBOR submitter

7    at Barclays "stated in an internal email that 'LIBORs are not reflecting the true cost of money.  I

8    am going to set 2 and 3 months, 5.13 and 5.12 probably at the top of the range of rates set by libor

9    contributors, although brokers tell me that [Panel Bank 7] is going to set at 5.15 for both (up 8.5

10   and 10 from yesterday).  The true cost of money is anything from 5-15 basis points higher.'"[112]

11        198.    Additionally, the CFTC cited a November 29, 2007 telephone discussion involving

12   Barclays' U.S. Dollar LIBOR submitters—as well as their supervisor, who convened the call—

13   and the senior Barclays Treasury managers, during which "[t]he supervisor said if the submitters

14   submitted the rate for a particular tenor at 5.50, which was the rate they believed to be the

15   appropriate submission, Barclays would be twenty basis points above 'the pack' and 'it's going to

16   cause a shit storm.'"[113]  In response to the supervisor's request "that the issue be taken 'upstairs,'

17   meaning that it should be discussed among more senior levels of Barclays' management," the

18   most senior Barclays Treasury manager "agreed that he would do so."[114]  The group decided to

19   set Barclays' LIBOR submission for that day "at the same level as another bank, a rate of 5.3,

20   which was, again, not at the rate the submitters believed to be appropriate for Barclays."[115]

21

22

23

24   _____

25   [110] *Id.*

     [111] *Id.*

26   [112] Barclays FSA Final Notice ¶ 117 (italics and alteration in original).

27   [113] Barclays CFTC Order at 21.

     [114] *Id.*

28   [115] *Id.*

- 76 -

199.    Similarly, on March 19, 2008, one Barclays LIBOR submitter "instructed another to reduce Barclays' submissions during a telephone conversation: '*just set it where everyone else sets it, we do not want to be standing out*'."[116]

200.    Those findings indicate LIBOR Panel Banks—either directly or through intermediaries—informed each other of the quotes they were going to submit before they submitted them.  Without such collaboration, Barclays could not be sure the quote it intended to submit would fall "within the pack" or, more specifically, "within ten basis points of the submissions by the other U.S. Dollar panel banks," as Barclays senior Treasury managers had directed.  Moreover, it is highly unlikely—if not impossible—that Barclays simply could have predicted its fellow LIBOR Panel Banks' quotes based on their quotes from the previous day (which were published), because LIBOR quotes often differed markedly from day to day.  For instance, the FSA observed that on November 29, 2007, "all the contributing banks' submissions for one month US dollar LIBOR increased by a range of 35 to 48 basis points."[117]

### 2.    Materials released, and testimony provided, in the wake of the Barclays settlements confirms—and amplifies—the agencies' findings.

201.    The Barclays settlements—particularly the factual findings they entailed—precipitated a management shakeup at the bank.  On July 1, 2012, Barclays announced the resignations, effective immediately, of its Chief Executive Officer Robert ("Bob") Diamond and Chief Operating Officer Jerry del Missier, and the next day announced the resignation of its Chairman Marcus Agius.

202.    Shortly after those revelations, Bloomberg reported that Diamond's resignation "underscores the disconnect between the market's perception of bank borrowing costs and the benchmark for $360 trillion of global securities."[118]  The article specified that Barclays went from reporting in January 2012 that it could "borrow for three months at interest rates that were on average above other banks" to reporting it could "borrow more cheaply than its peers," even

---

[116] Barclays FSA Final Notice ¶ 123 (italics in original).

[117] *Id.* ¶ 118.

[118] Paul Armstrong, "Diamond's Exit Shows Libor Only What Each Bank Says It Is," Bloomberg, July 3, 2012.

1  though, according to data compiled by Bloomberg, "the cost of insuring the London-based firm's

2  debt using credit-default swaps rose 33 percent."  Bloomberg further stated, "The contrast

3  between banks' daily submissions for Libor and other measures of their creditworthiness shows

4  why regulators from Europe to the U.S. are beginning to fine them for manipulating the market

5  for short-term rates."  The article quoted a senior rates specialist at ING Groep NV as stating,

6  "After the Barclays admission, we have proof that Libor is not a reliable benchmark."

7  203.   Following in the wake of the Barclays settlements, documents and other materials

8  released from several sources—including Barclays, the BBA, the Federal Reserve Bank of New

9  York, and the Bank of England—as well as testimony provided to the British Parliament or the

10  U.S. House of Representatives by key players at Barclays and other institutions, corroborated the

11  findings made in connection with the Barclays settlements and offered further insight into the

12  manipulation of LIBOR.

13  204.   In testimony before the British Parliament on July 16, 2012, for example, former

14  Barclays CFO Jerry del Missier admitted to directing rate submitters at Barclays to submit false

15  LIBOR quotes to the BBA, which former CEO Bob Diamond had instructed him to do.

16  205.   Del Missier testified that on October 29, 2008, Diamond "said that he had a

17  conversation with Mr [Paul] Tucker[, Deputy Governor] of the Bank of England, that the Bank of

18  England was getting pressure from Whitehall around Barclays—the health of Barclays—as a

19  result of LIBOR rates, that we should get our LIBOR rates down, and that we should not be

20  outliers."  Del Missier "passed the instruction, as [he] had received it, on to the head of the money

21  markets desk."  Specifically, he "relayed the contents of the conversation that [he] had with Mr

22  Diamond, and fully expected that the Bank of England's views would be incorporated in the

23  LIBOR submissions," i.e., "[g]iven that Barclays was [submitting] high rates," del Missier

24  "would have expected that taking that into account would have resulted in lower submissions."

25  206.   Del Missier equivocated when pressed as to whether he believes the submission of

26  artificially low LIBOR quotes was illegal, though he conceded that the Barclays DOJ Statement

27  characterized Barclays' "manipulating its submissions for benchmark interest rates in order to

28  benefit its trading positions and the media's perception of the bank's financial health" as "illegal

1    activity."  When asked when he first realized "that [he] had authorised, knowingly or

2    unknowingly, illegal activity, found to be illegal by the US Department of Justice," del Missier

3    stated, "In the early months of 2010."

4         207.    Moreover, though del Missier testified that in late October 2008, making false

5    LIBOR submissions "did not strike [him] as improper," when asked whether he now agrees with

6    the DOJ, del Missier responded, "I am certainly not going to disagree with the Justice

7    Department."  In response to the committee chairman's follow-up question—"Does that mean

8    that you agree with it?"—del Missier conceded, "I agree with it."

9         208.    Additionally, contrary to del Missier's testimony that Diamond's instruction to

10   him emanated from the Bank of England, Paul Tucker, Deputy Governor of the Bank, has denied

11   telling Diamond to have Barclays submit lower LIBOR quotes.

12        209.    In testimony before Parliament on July 9, 2012, Tucker recounted that, in speaking

13   with Diamond on the October 29, 2008 call referenced above, Tucker "wanted him to be sure that

14   the senior management of Barclays was overseeing the day-to-day money-market operations and

15   treasury operations and funding operations of Barclays so that Barclays' money desk did not

16   inadvertently send distress signals."  Tucker added, "In actual paying up for money in terms of

17   what you borrow, you do not need to be at the top of the market all of the time.  It is very

18   important not to come across as desperate.  That is not a point about LIBOR submissions, where

19   people should just obey the rules."  (Emphasis added).  A committee member then asked, "But

20   doesn't the danger of that call being misinterpreted, either by Mr Diamond or its file note being

21   misinterpreted later by Mr del Missier, lie in the fact that you and other participants in the Money

22   Markets Liaison Group were already aware at least a year earlier that there was suspicion on

23   behalf of some of the participants that rates were not being reported accurately?"  Tucker

24   responded, in part, "[I]t was not remotely in my mind during this conversation that I could be

25   misinterpreted, either by Bob Diamond or by anybody else."

26        210.    Internal documents released by the Federal Reserve likewise demonstrate

27   Barclays' misconduct and further indicate LIBOR panel banks communicated about their LIBOR

28   submissions before providing them to the BBA.  For example, during an October 24, 2008

telephone conversation with a representative of the Federal Reserve Bank of New York (as recounted in a transcript released by the New York Fed), a Barclays employee stated "three-month libor **is going to come in at** 3.53."  (Emphasis added).  The Barclays employee further explained to the Fed representative, "[I]t's a touch lower than yesterday's but please don't believe it.  It's absolute rubbish."  Later in the call the Barclays employee observed, "[R]ecently you've had certain banks who I know have been paying 25 basis points over where they've set their libors. . .aah just the other day there was one bank who was paying 3.75, he sets his libor at 3.70."  (Ellipsis in original).

### 3.    U.S. and foreign government entities have also issued findings in connection with settlements with UBS, which demonstrate that UBS submitted unduly low LIBOR quotes during the Relevant Period.

211.    On December 19, 2012, the DOJ, CFTC, FSA, and FINMA announced settlements with UBS arising from the bank's attempted and actual manipulation of LIBOR and other benchmark rates.  The DOJ also disclosed the filing of a criminal complaint against two former UBS employees.  In connection with the settlements, which collectively obligated UBS to pay approximately $1.5 billion, the agencies issued findings detailing UBS's misconduct.

212.    The agencies found that during the financial crisis, members of UBS management directed that, in determining the bank's submissions in U.S.-Dollar LIBOR as well as LIBOR for other currencies, LIBOR submitters either "err on the low side" or aim to fall in "the middle of the pack."[119]

---

[119] UBS DOJ Statement ¶ 100; *see also, e.g.*, UBS FSA Final Notice ¶ 22 ("After 9 August 2007, and in reaction to increased media scrutiny of the financial standing of banks and banks' LIBOR submissions during the financial crisis, UBS issued directives to its LIBOR submitters intended to:  '*protect our franchise in these sensitive markets*'.  These informal directives were disseminated by UBS's Group Treasury and Asset and Liability Management [ALM] Group about the approach to LIBOR submissions."); UBS CFTC Order at 41 ("Certain Group Treasury and ALM managers issued the broad directions without ascertaining or requiring the Trader-Submitters to ascertain the costs of borrowing unsecured funds in the relevant markets or ensuring that such directions were in accord with the definitions and criteria of the benchmark interest rates. . . . When the submitters followed the directions, they impacted UBS's submissions.  As a result, at times during the financial crisis, UBS's submissions did not accurately or solely reflect or relate to UBS's assessment of the costs of borrowing funds in the relevant interbank markets."); UBS FINMA Summary Report at 8 ("Evidence suggests that . . . GT [Group Treasury] and Asset and Liability (ALM) employees gave improper guidance on UBS's LIBOR submissions on a number of occasions . . . .").

213.    Notwithstanding the long-established requirements with respect to determining LIBOR quotes, from early August 2007 to at least April 2009, "certain UBS managers issued directions for making UBS benchmark interest rate submissions in order to protect against what UBS perceived as unfair and inaccurate negative public and media perceptions about UBS."[120] Specifically, "certain UBS managers and senior managers" in the bank's Group Treasury and Asset and Liability Management ("ALM") groups "directed that UBS LIBOR submitters should either 'err on the low side' in determining UBS's submissions or should make submissions that would be in 'the middle of the pack' of the other Contributor Panel banks."[121]  Those Group Treasury and ALM managers "did not provide any guidance to [the] submitters as to how to implement these directions, other than simply to follow them."[122]

214.    The instructions "were issued, at least in significant part, because of concerns that if UBS submitted higher LIBOR rates relative to other banks, UBS could attract negative attention in the media" (which, during "some" period of time, UBS personnel considered "unjustified").[123]  UBS "sought to avoid negative media attention and, relatedly, sought to avoid creating an impression that it was having difficulty obtaining funds."[124]  To the extent those directions from UBS management "were motivated by reputational concerns," they "were inconsistent with the definition of LIBOR."[125]  Moreover, those directions "influenced the formulation of UBS's LIBOR submissions during some periods of time."[126]

   a.    **August 2007 through early April 2008:  UBS directed LIBOR submitters to "err on the low side" of the range of panel banks' quotes.**

215.    The "err on the low side" directive began on August 9, 2007, when an ALM senior manager in Zurich sent an e-mail directing U.S.-Dollar and Euro-LIBOR submitters at UBS "to

---

[120] UBS CFTC Order at 4; *see also* UBS DOJ Statement ¶¶ 124, 131.

[121] UBS DOJ Statement ¶ 100.

[122] UBS CFTC Order at 41.

[123] UBS DOJ Statement ¶ 100.

[124] *Id.*

[125] *Id.*

[126] *Id.*

'err on the low side' compared to the LIBOR submissions of other Contributor Panel banks, in order to protect [UBS]'s reputation."[127]  That instruction stemmed from media reaction after UBS, earlier that day, "increased its overnight-rate U.S. Dollar LIBOR submission by an unusually high amount from the day before."[128]

216.    Following the "unusual" submission, a Bloomberg reporter "contacted UBS to ask for comment . . . and told UBS that the reporter intended to discuss the jump in connection with stories regarding the collapse of the commercial paper market."[129]  The reporter noted UBS and another bank "had been 'hit the worst' and asked for an explanation"; the reporter further indicated "this was a 'huge story.'"[130]

217.    The Bloomberg reporter's inquiry "caused concern" within UBS, "especially because UBS was scheduled to announce its quarterly results the following week."[131]  The UBS press office forwarded the reporter's e-mail to a senior manager in the bank's Group Treasury department, observing:  "Given that we are announcing our results next week this will need urgent attention."[132]  The senior manager in Group Treasury "was concerned about these events and asked the head of ALM in Zurich to look into the matter."[133]  The head of ALM, in turn, "concluded that the UBS overnight rate LIBOR submission was in fact higher than it should have been," and he "was concerned that the public and press could interpret this high submission as an indication that the bank was having trouble funding itself, when in fact it was not."[134]  The head of ALM therefore "determined that UBS should be submitting LIBORs 'on the low side' relative to other panel banks' submissions," and he "memorialized this decision in an August 9, 2007 email to a senior manager in Group Treasury in Stamford[, Connecticut], the manager of the

---

[127] *Id.* ¶ 102.

[128] *Id.* ¶ 103.

[129] *Id.*

[130] *Id.*

[131] *Id.* ¶ 104.

[132] *Id.*

[133] *Id.*

[134] *Id.* ¶ 105.

derivatives trading desk that submitted the majority of UBS's LIBOR contributions, and others."[135]  The ALM head's e-mail stated, "[I]t is highly advisable to err on the low side with fixings for the time being to protect our franchise in these sensitive markets.  Fixing risk and [profit and loss] thereof is secondary priority for now."[136]

218.    That direction "stemmed from a desire to ensure that UBS's LIBOR submissions did not convey to the media or market what UBS believed to be an inaccurate message about UBS's financial stability or otherwise harm UBS's reputation in the increasingly uncertain environment created by the financial crisis."[137]  Indeed, "[t]he idea was that, going forward, UBS's submissions were to portray a view that UBS was more creditworthy than other panel banks and, therefore, UBS should not make higher submissions and be an outlier as compared to other panel banks."[138]

219.    Managers in UBS's Group Treasury and ALM groups did not take "any steps to ensure that the 'err on the low side' direction for making LIBOR submissions complied with the BBA's definition and criteria for making LIBOR submissions or that it related to UBS's costs of borrowing in the London interbank market."[139]

220.    UBS "promptly disseminated the direction to err on the low side."[140]  On August 9, 2007, a UBS rates manager (whom the CFTC identified as "Rates Manager A") "confirmed that the necessary coordination was in place: 'We have already co-ordinated our efforts with [Senior Rates/STIR Manager][141] and [U.S. Dollar Trader-Submitter 1] on the usd libors will be speaking to [U.S. Dollar Trader 1] and [Euro Trader 1] will be liaising with [Senior STIR Manager B] on the eurolibors before our numbers are input.'"[142]

---

[135] *Id.*

[136] *Id.*  The DOJ explained that the e-mail's references to "fixing risk" and profit and loss "reflect an awareness that others at UBS were manipulating LIBOR to benefit trading positions."  *Id.* ¶ 105 n.16.

[137] UBS CFTC Order at 43.

[138] *Id.*

[139] *Id.*

[140] *Id.*

[141] "STIR" stands for "Short Term Interest Rate."

[142] UBS CFTC Order at 43.

221.    U.S. Dollar Trader 1 in Zurich and U.S. Dollar Trader-Submitter 1 in London "discussed the 'err on the low side' direction, and their submissions immediately started reflecting the directions."[143]  On August 10, 2007, for example, the traders engaged in the following exchange:

> U.S. Dollar Trader 1:  "o;n just trading way lower . . . so I would go for a pretty low run . . . **aim should really be to be on the lower side of range"**

> U.S. Dollar Trader-Submitter 1:  "just looking for early indications for o/n 1w and 2wks – understand mkt dropping fast – so early indics for now then true [levels] at 11 am – pls"

> U.S. Dollar Trader 1:  "o/n would go for 5.70 . . . 1wk 5.70 . . . 2wk 5.60 . . . **this seems probably a tad low right now, but recon thats what we should try to be**"

> U.S. Dollar Trader-Submitter 1:  **"kk – will check back at 11[when the submissions had to be made] – as you say always want to err on the low side** – thks for colour – may even swap ideas about 1m 2m and 3 mo with you too in curect climate – sure few weeks down the road then will only need to chat about v short dates ie <1mo – appreciate colour"

> U.S. Dollar Trader 1:  "np at all . . . we just dont want to give the market a wrong impression . . . we not struggling to get cash . . . so therefore dont want to be on the highs of libors"[144]

222.    On August 14, 2007, U.S. Dollar Trader 1 "confirmed again, 'my indications are deliberately on the low side…' and U.S. Dollar Trader-Submitter 1 agreed, 'y[es] pls err on the side of caution as before – once teh [sic] mkt normalizes…then we can adj accordingly….'"[145]

223.    Additionally, on September 3, 2007, "U.S. Dollar Trader 1 explained to an ALM manager his understanding of why UBS wanted to 'err on the low side,' stating that UBS did not want 'to be seen to pay higher or at libor in the market to avoid trouble.'"[146]  And on September 5, 2007, "U.S. Dollar Trader-Submitter 1 explained he was following the 'err on the low side' direction to his supervisor, Senior Rates Manager C":

---

[143] *Id.*

[144] *Id.* at 44.

[145] *Id.*

[146] *Id.*

"fyi libor has been fuctioning [sic] for many years – current turbulance [sic] and american home owners exposure to libor may trigger further questions – since the mkt dislocation I am now keeping a record of UBS libor fixings vs the implied rates – **we are fixing on the low side of all other banks in the libor panel in the 4- 12 mo period by several bps** – and we are still fixing 12 – 15 over implied rates – **I can justify my fixings each day if asked** – I se [sic] longer dated libors even lower however the rest of he [sic] mkt continue to call libors higher than UBS – **we should be protected from moral hazard as a bank. Short rates coming grom [sic] Zurich now – again asa [sic] bank we are erring on the low side."**[147]

224.    UBS managers subsequently "monitored how UBS's LIBOR submissions sent signals to the markets and the press about UBS's ability to obtain funds."[148]  As part of their "daily internal calls about liquidity and funding as the financial crisis intensified," UBS managers "received internal analyses about UBS's LIBOR submissions relative to other panel banks."[149]  Specifically, "UBS ALM Manager A circulated spreadsheets about the panel banks' submissions for U.S. Dollar, Euro, Sterling, Swiss Franc and Yen LIBOR, showing how UBS compared to the other banks."[150]  In a September 4, 2007 e-mail, for example, "ALM Manager A wrote, 'For those interested, this new tool shows where each bank on the Libor fixing panel quoted their offer level in today's fixing.  Should give some insights into the funding situation at our peers.  Note Barclays are consistently amongst the highest contributors and UBS are often the lowest.'"[151]  On September 10, 2007, the ALM manager wrote "'we're still contribute [sic] the lowest rates in most currencies.'"[152]  Notably, "the spreadsheets and 'tools' provided to the managers did not include information about UBS's actual transactions in the relevant unsecured interbank cash markets or any other information relating to costs of borrowing in those markets."[153]

---

[147] *Id.*

[148] *Id.* at 45.

[149] *Id.*

[150] *Id.*

[151] *Id.*

[152] *Id.*

[153] *Id.*

225.    UBS's "err on the low side" directive "generally applied to UBS's U.S. Dollar LIBOR submissions for the rest of 2007."[154]  The bank's submissions "moved to the lowest quartile of the panel submissions almost immediately after the issuance of the August 9, 2007 direction and, in some tenors, often remained in the lowest quartile for the rest of the year and through March 2008."[155]  Indeed, UBS's LIBOR submissions continued to fall "on the low side" of the Panel Banks' submissions into April 2008, "when UBS was submitting its 3-month U.S. Dollar LIBOR contribution below the rates it was paying to obtain unsecured funding at that maturity, such as by issuing commercial paper."[156]  Commenting on that disparity during an April 10, 2008 electronic chat, a UBS derivatives trader in London stated to the senior manager heading ALM, "if we are [issuing commercial paper] at 2.81% and that is 3m libor +10 . . . why aren't we putting our 3m rate in at 2.81% for libors [?]"[157]  The ALM senior manager responded, "we should," to which the trader replied, "but then [Group Treasury] will rip our boys a new one for being the highest bank in the poll."[158]  After August 9, 2007, "UBS's LIBOR submissions remained generally in the lower half of the Contributing Panel banks' contributions until April 2008."[159]

**b.    April-May 2008:  UBS directed its LIBOR submissions to fall within the "middle of the pack" of panel banks.**

226.    The "err on the low side" directive ceased in the wake of *The Wall Street Journal*'s April 16, 2008 article reporting that U.S.-Dollar LIBOR panel banks, including UBS, "were routinely submitting inaccurately low LIBORs in order to make themselves appear more creditworthy," as well as the BBA's announcement the same day that "it would expel any banks from the Contributor Panel if it found that they were deliberately making inaccurate LIBOR

---

[154] *Id.*

[155] *Id.* at 46.

[156] UBS DOJ Statement ¶ 110.

[157] *Id.*

[158] *Id.*

[159] *Id.* ¶ 111.

1    submissions."[160]  The next day, "all of UBS's U.S. Dollar LIBOR submissions rose

2    substantially," as they did the following day [April 18, 2008]."[161]

3         227.    Following the *Journal* article and the BBA announcement, the "err on the low

4    side" instruction "was initially replaced with a new effort to make LIBOR submissions 'in the

5    middle of the pack' of the Contributing Panel banks."[162]  In that regard, on April 17, 2008, a UBS

6    advisor "tasked with advising the U.S. Dollar submitter each day" sent an e-mail to the U.S.-

7    Dollar LIBOR submitter "informing him/her that 'the guidance I got from my management with

8    regards to libors is that we should aim to be in the middle of the pack . . . ([Group Treasury] got

9    on their back again as well).'"[163]  "Immediately" after that direction was issued on or about April

10   17, 2008, "UBS's LIBOR submissions were in the middle of the submissions of the Contributor

11   Panel banks for the next several days."[164]

12        228.    Notably, on May 21, 2008, in response to a *Wall Street Journal* reporter's question

13   to UBS, by e-mail, "why back in mid-April [2008] UBS had been 'paying 12 basis points for CP

14   [commercial paper] more than it was posting as a Libor quote?'", the senior manager heading

15   ALM forwarded a proposed answer to the Group Treasury senior manager in Stamford,

16   Connecticut:  'the answer would be 'because the whole street was doing the same and because we

17   did not want to be an outlier in the libor fixings, just like everybody else."[165]

18        229.    Communications reflecting the "middle of the pack" approach "continued in late

19   2008 and early 2009."[166]  Moreover, "[t]he directive to submit LIBOR contributions to be in the

20   middle of the pack of other banks' anticipated submissions was well known to certain LIBOR

21   submitters and their managers."[167]

22

23   [160] *Id.* ¶ 114.

24   [161] *Id.*

     [162] *Id.* ¶ 115.

25   [163] *Id.*

26   [164] *Id.* ¶ 116.

27   [165] *Id.* ¶ 117.

     [166] *Id.* ¶ 124.

28   [167] *Id.* ¶ 129.

1

2

###     c.    June 17, 2008 to at least early 2009:  UBS revived its "middle of the pack" directive.

3

4

5

6

7

8

9

230.    After briefly discontinuing its "middle of the pack" directive, by June 17, 2008, "in reaction to being a high outlier on the U.S. Dollar panel," UBS "decided to return to the 'middle of the pack.'"[168]  That day, "Senior STIR Manager C went to the trading floor in Zurich and directed that UBS's LIBOR submissions be lowered so that UBS would be in 'the middle of the pack' of the submitting banks."[169]  Also that day, "U.S. Dollar Trader-Submitter 3 discussed with ALM Manager B the need to implement the 'middle of the pack' direction quickly and that the 'middle of the pack' direction would be in place 'until further notice.'"[170]

10

11

12

13

14

15

16

231.    From June 17 through December 2008, "UBS was in the middle of the pack virtually every day, with very little deviation in its submissions."[171]  Indeed, UBS "remained in the middle of the pack even after October 16, [2008], when it received approximately $59 billion in funds from the Swiss government and the Swiss National Bank and borrowed over $77 billion from the various liquidity programs of the Federal Reserve Bank."[172]  UBS "continued to submit in the middle of the pack throughout at least the first half of 2009, despite UBS's February 10, 2009 announcement of an 8.1 billion Swiss Franc loss for the fourth quarter of 2008."[173]

17

18

19

232.    In sum, UBS "knew that concerns about reputation or perceived inaccurate negative market or press reports were not legitimate or permissible factors on which to base [its] daily LIBOR and other benchmark interest rate submissions."[174]  Despite that understanding,

20

---

[168] *Id.*

21

22

23

[169] *Id.*; *see also* UBS DOJ Statement ¶ 120 (finding that "[d]uring the week of June 16, 2008," a Zurich-based UBS senior manager "directed U.S. Dollar LIBOR submitters to lower their submissions over the next three days 'to get in line with the competition' because, by contributing LIBOR submissions closer to CD and CP [commercial paper] issuance levels, UBS was becoming an outlier relative to other Contributor Panel banks").

24

[170] UBS CFTC Order at 50.

[171] *Id.* at 51.

25

[172] *Id.*

26

27

[173] *Id.* at 51-52.  The DOJ found that the "middle of the pack" directive lasted until about April 2009.  The DOJ specified that for "approximately the next 10 months" after the week of June 16, 2008, UBS's three-month U.S.-Dollar LIBOR submissions "were identical to the published LIBOR fix, and largely consistent with the published LIBOR fix in the other tenors."  UBS DOJ Statement ¶ 122.

28

[174] UBS CFTC Order at 52.

1    UBS "at times" during the financial crisis "made its U.S. Dollar LIBOR submissions and other

2    benchmark interest rate submissions in accordance with Group Treasury and ALM managers'

3    directions, and not in accordance with the relevant definitions and criteria for those rates."[175]

4    Those submissions "were knowingly false because such submissions did not reflect solely UBS's

5    assessment of the costs of borrowing unsecured funds in the relevant interbank market at that

6    time."[176]  The submissions thus "constituted false, misleading or knowingly inaccurate reports

7    that affected or tended to affect LIBOR, Euribor or Euroyen TIBOR."[177]

8    233.    Moreover, UBS "fail[ed] to take reasonable care to organise and control its affairs

9    responsibly and effectively with adequate risk management systems, in relation to its LIBOR and

10   EURIBOR submissions process."[178]  The duration and extent of UBS's wrongdoing were

11   "exacerbated by these inadequate systems and controls."[179]  Indeed, from January 1, 2005 to

12   August 2008, "UBS had no systems, controls or policies governing the procedures for making

13   LIBOR submissions."[180]

14   **4.    U.S. and foreign entities have also issued findings in connection with**
15   **settlements with Rabobank, which demonstrate that Rabobank submitted unduly low LIBOR quotes during the Relevant Period.**

16   234.    On October 29, 2013, the DOJ, CFTC, FCA, and Dutch Openbaar Ministerie

17   announced settlements with Rabobank arising from the bank's attempted and actual manipulation

18   of LIBOR and Euribor.  The settlements collectively obligated Rabobank to pay approximately

19   $1.1 billion.

20   235.    The DOJ, CFTC, and FCA found that, during the Relevant Period, Rabobank

21   traders repeatedly asked Rabobank's LIBOR submitters to "submit preferential rates in attempts

22   to manipulate U.S. Dollar and Yen LIBOR, Euribor, and on occasion, Sterling LIBOR, to benefit

23   Rabobank traders' cash and derivatives trading positions that were tied to these benchmark

24

---

[175] *Id.*

25   [176] *Id.*

26   [177] *Id.*

27   [178] UBS FSA Final Notice ¶ 25.

[179] *Id.*

28   [180] *Id.* ¶ 26.

interest rates."[181]  Rabobank's LIBOR submitters agreed to fulfill such requests, which resulted in a manipulation of LIBOR.[182]

236.    Between 2005 and early 2011, Rabobank lacked internal controls, procedures, and policies specifically relating to its LIBOR submission process, which allowed Rabobank employees to make false submissions and thereby manipulate LIBOR.[183]  Rabobank did not have an express policy to address LIBOR submission procedures until March 30, 2011.[184]

237.    During the Relevant Period, Rabobank colluded with other Defendants to manipulate LIBOR.[185]

238.    On January 13, 2014, DOJ criminally charged three former Rabobank employees for their roles in manipulating Yen-LIBOR.

### H.    The Ongoing LIBOR Government Investigations, which Have Targeted Many (If Not All) of the LIBOR Panel Banks, Are Expected to Produce Additional Settlements or Charges.

239.    During the 10 months since the Barclays settlements were publicly disclosed, news has continued to emerge regarding the likelihood that other LIBOR panel banks will settle, or be charged with liability by, government agencies in the U.S. or abroad.  And, indeed, as recounted above, during the past several months government entities (including the DOJ and the CFTC) have entered into agreements with UBS and RBS, and the DOJ has brought claims against individuals from UBS and entered into a plea agreement with RBS Securities Japan Ltd. (for alleged misconduct relating to Yen-LIBOR).  Indications are that settlements or charges against other LIBOR panel banks are in the offing.

240.    On July 12, 2012, Bloomberg reported the LIBOR scandal "has the potential to become one of the most costly and consequential in the history of banking."[186]  The editorial further observed that investigators in the U.S., Canada, Europe, and Asia "are piecing together a

---

[181] Rabobank CFTC Order at 2.
[182] Rabobank CFTC Order at 2; Rabobank FCA Notice ¶ 2.5; Rabobank DOJ Statement ¶ 15.
[183] Rabobank CFTC Order at 3; Rabobank FCA Notice ¶¶ 2.3, 2.20-2.26.
[184] Rabobank FCA Notice ¶ 2.3.
[185] Rabobank CFTC Order at 2; Rabobank FCA Notice ¶¶ 2.11-2.14; Rabobank DOJ Statement ¶¶ 69-84.
[186] Editorial, "The Worst Banking Scandal Yet?" Bloomberg, July 12, 2012.

breathtaking portrait of avarice and deceit" and that Barclays' $450-million penalty "is only the beginning," as "[r]egulators can and should hit more banks with large fines to prevent a repeat." Additionally, the editors noted, "criminal charges for the first time could threaten a significant number of bankers and traders with jail terms for their actions during the financial crisis -- a much needed comeuppance that could help reset the industry's moral compass."

241.    Commenting to *The New York Times* on the Barclays settlements, Benjamin Heineman, former general counsel of General Electric and now a distinguished senior fellow at Harvard Law School, observed, "This looks like a classic case where they [the government] squeezed Barclays and Barclays yelped, which will be important for the making of cases against other Libor banks.  There was obviously collusion with other banks."[187]

242.    The media further reported, based on information obtained from government officials, that government investigations regarding LIBOR manipulation stretch well beyond Barclays and are likely to result in settlements, fines—and even criminal liability—for other banks.

243.    On July 14, 2012, for example, *The New York Times* reported the DOJ "has identified potential criminal wrongdoing by big banks and individuals at the center of the [LIBOR] scandal," as the department's criminal division "is building cases against several financial institutions and their employees."[188]  The article noted the authorities "expect to file charges against at least one bank later this year," according to a government official.  The *Times* further reported that the multiyear LIBOR investigation "has ensnared more than 10 big banks in the United States and abroad" and that "the prospects of criminal action" have caused "several firms" to "scramble[e] to arrange deals, according to lawyers close to the case."

244.    A July 20, 2012 *CNNMoney* article posited "Barclays the biggest Libor liar? No, that may have been Citi."[189]  The article observed that Citigroup CEO Vikram Pandit recently had

---

[187] James B. Stewart, "Calculated Deal in a Rate-Rigging Inquiry," *The New York Times*, July 13, 2012.

[188] Ben Protess & Mark Scott, "U.S. Is Building Criminal Cases in Rate-Fixing," *The New York Times*, July 14, 2012.

[189] Stephen Gandel, "Barclays the biggest Libor liar? No, that may have been Citi," *CNNMoney*, July 20, 2012.

1    "told analysts not to use Barclays' $450 million Libor settlement as a guidepost for what his firm

2    might have to pay."  Citing the study by Snider and Youle detailed above—showing that "on

3    average Citi understated its borrow[ing] costs by an average of 0.12 percentage points from

4    August 2007 to August 2008," which was "50% more than the 0.08 percentage points that

5    Barclays under report[ed] its own borrowing costs"—the article suggested Citigroup "might end

6    up paying much more" than Barclays did.

7        245.    On July 22, 2012, Reuters reported U.S. prosecutors and European regulators "are

8    close to arresting individual traders and charging them with colluding to manipulate global

9    benchmark interest rates, according to people familiar with a sweeping investigation into the rate-

10   rigging scandal."[190]  Reuters further noted it previously had reported "that more than a dozen

11   current and former employees of several large banks are under investigation, including Barclays

12   Plc, UBS and Citigroup, and have hired defense lawyers over the past year as a federal grand jury

13   in Washington, D.C., continues to gather evidence."  Reuters later reported, on August 4, 2012,

14   that Ryan Reich, a "former Barclays Plc swaps trader in New York" whom Barclays fired in

15   2010, "is among those drawing scrutiny from prosecutors in the deepening scandal over the

16   manipulation of global benchmark interest rates."[191]  According to "several people familiar with

17   the situation," Reuters noted, "U.S. prosecutors in Washington, D.C. are looking at . . . Reich's

18   activities while at Barclays between August 2006 and March 2010."  The article further observed

19   that Reich "was a part of a low-profile New York trading desk at Barclays that is now

20   increasingly in focus as prosecutors and regulators extend their investigation of the Libor

21   scandal."

22       246.    On July 24, 2012, *The Wall Street Journal* similarly reported, based on

23   information provided by "people close to the [LIBOR] probe," that "[t]he emerging details about

24   traders suggest to investigators a widespread conspiracy that continued for several years and

25

26   _____

     [190] Matthew Goldstein, Jennifer Ablan & Philipp Halstrick, "Libor Investigation Close To Making Arrests:

27   Report," Reuters, July 22, 2012.

     [191] Jennifer Ablan, Matthew Goldstein & Carrick Mollenkamp, "Fired Barclays trader draws scrutiny in

28   Libor probe," Reuters, Aug. 4, 2012.

1  cascaded around the world."[192]  The *Journal* observed that "[t]he widening interest-rate scandal"

2  has "ensnared at least 16 financial institutions."  The article further noted regulators and

3  prosecutors "are being helped by Barclays and . . . UBS AG, which employed traders who

4  allegedly were leaders of two groups now under investigation, according to people familiar with

5  the matter."

6         247.    On July 27, 2012, Reuters reported Lloyds Banking Group had "received

7  subpoenas from government agencies" investigating the LIBOR scandal, which the bank

8  disclosed in its 2011 annual report.[193]

9         248.    On August 2, 2012, Bank of America disclosed in an SEC filing that it had

10  received subpoenas and requests for information from the DOJ, CFTC, and FSA concerning

11  "submissions made by panel banks in connection with the setting of London interbank offered

12  rates and European and other interbank offered rates."

13         249.    Revelations concerning other LIBOR panel banks have come to light as well.  On

14  August 8, 2012, for example, *The Wall Street Journal* reported that U.S. prosecutors "have agreed

15  to shield several former UBS AG employees from criminal charges in return for their cooperation

16  with the escalating investigation of suspected interest-rate manipulation," according to "a person

17  close to the probe."[194]  The *Journal* further reported that, according to one of its sources, the

18  DOJ's Antitrust Division "is investigating suspected collusion between different banks to

19  manipulate interest rates, including [LIBOR]," while the DOJ's Fraud section "is focusing on

20  alleged wrongdoing within individual firms."

21         250.    JPMorgan also resides at the center of the LIBOR storm.  On August 9, 2012,

22  JPMorgan disclosed in an SEC filing that regulators had asked the bank for information—through

23  subpoenas, requests for documents, and, in some cases, interviews, from the DOJ, CFTC, SEC,

24

25

26  [192] Jean Eaglesham & David Enrich, "Libor Probe Expands to Bank Traders," *The Wall Street Journal*, July 27, 2012.

27  [193] Matt Scuffham & Steve Slater, "British bank Lloyds gets Libor subpoenas," Reuters, July 24, 2012.

28  [194] Jean Eaglesham & Joe Palazzolo, "Ex-UBS Traders Offered Deal by U.S. in Rate Probe," *The Wall Street Journal*, Aug. 8, 2012.

FSA, European Commission, Canadian Competition Bureau, Swiss Competition Commission, and other regulatory authorities and banking associations around the world.

251.    On September 5, 2012, as reported by Reuters, the CEO of Société Générale, Frederic Oudea, stated the bank is cooperating with U.S. authorities in connection with their LIBOR investigation, while the bank continues its own internal probe.[195]

252.    Revelations about regulators' investigations of other LIBOR panel banks likewise have recently emerged. Bloomberg reported on October 26, 2012 that Bank of America, RBC, and Société Générale "are among nine additional banks subpoenaed in a multistate investigation of alleged manipulation of Libor," according to a source "familiar with the matter." Bloomberg further detailed that New York Attorney General Eric Schneiderman issued the subpoenas starting in August 2012. According to Bloomberg's source, Attorney General Schneiderman and Connecticut Attorney General George Jepsen, in connection with their joint investigation into possible LIBOR manipulation, have subpoenaed 16 banks in total, including (aside from the three banks identified above) JPMorgan Chase and Barclays.

### PLAINTIFF DID NOT KNOW, NOR COULD IT REASONABLY HAVE KNOWN, ABOUT DEFENDANTS' MISCONDUCT UNTIL AT LEAST MARCH 2011

253.    Before UBS's March 15, 2011 announcement that it had been subpoenaed in connection with the U.S. government's investigation into possible LIBOR manipulation, Plaintiff had not discovered, and could not with reasonable diligence have discovered, facts indicating Defendants were knowingly engaging in misconduct that caused LIBOR to be artificially depressed during the Relevant Period.

254.    Moreover, though some market participants voiced concerns in late 2007-early 2008 that LIBOR did not reflect banks' true borrowing costs, those concerns were quickly— though, it now turns out, wrongly—dismissed.

### A.    Defendants' Unlawful Activities Were Inherently Self-Concealing.

255.    Panel Bank Defendants conspired to share information regarding their LIBOR quotes and to misrepresent their borrowing costs to the BBA. In so doing, Panel Bank

---

[195] "SocGen cooperating with U.S. in Libor probe," Reuters, Sept. 5, 2012.

1    Defendants aimed to, and did, depress LIBOR to artificially low levels, which allowed them to

2    pay unduly low interest rates on LIBOR-based financial instruments they or others issued or sold

3    to investors, including Plaintiff.

4        256.    Defendants' misconduct was, by its very nature, self-concealing.  First, those

5    banks' actual or reasonably expected costs of borrowing were not publicly disclosed, rendering it

6    impossible for investors, including Plaintiff, to discern (without sophisticated expert analysis) any

7    discrepancies between Panel Bank Defendants' publicly disclosed LIBOR quotes and other

8    measures of those banks' actual or reasonably expected borrowing costs.  Second,

9    communications within and among the banks likewise were not publicly available, which further

10   precluded investors, including Plaintiff, from discovering Defendants' misconduct, even with

11   reasonable diligence.

12       257.    As a result of the self-concealing nature of Defendants' collusive scheme, no

13   person of ordinary intelligence would have discovered, or with reasonable diligence could have

14   discovered, facts indicating Panel Bank Defendants were unlawfully suppressing LIBOR during

15   the Relevant Period.  Indeed, particularly given the extraordinary disruption affecting the

16   financial markets during much of the Relevant Period, no reasonable investor would have had

17   reason to suspect that any observable discrepancies between LIBOR and other measures of Panel

18   Bank Defendants' costs of borrowing were due to misconduct—particularly knowing

19   misconduct—rather than market dislocation.

20   **B.    Defendants Deflected Concerns Raised by Some Market Observers and
           Participants In Late 2007 and Early 2008 About LIBOR's Accuracy.**

21       258.    In November 2007, a concern arose among some in the U.K. banking community

22   that the members of the USD-LIBOR panel might be understating their true costs of borrowing,

23   thus causing LIBOR to be set artificially low.  Some U.K. banks raised their concerns at a

24   meeting of the Bank of England that month.

25       259.    In response to those concerns, specifically "anecdotal evidence gathered from

26   conversation with market participants . . . that the rates quoted and paid by banks on their

27   interbank borrowing tended to vary more than usual (and by more than what appears in the

28

LIBOR panel) during the turbulence," the Bank for International Settlements ("BIS") in Spring 2008 produced a study of USD-LIBOR.  The BIS examined the difference, or "spread," between USD-LIBOR and OISs, which are viewed as virtually risk-free, thus the positive difference between LIBOR and interest rates on those swaps should reflect the credit risk of the quoting banks.  The BIS then compared the LIBOR-OIS spread to the cost of CDS insurance on the BBA panel banks' debt.  Absent manipulation, those two values should exhibit a stable relationship, because they both depend on the same thing:  the credit risk of the quoting banks.

260.    Contrary to that expectation, the BIS found an unusually "loose" relationship between CDS premiums and the LIBOR-OIS spread, beginning in August 2007 and continuing at least into 2008, when the BIS published its findings.  During that time, CDS premiums led the LIBOR-OIS spread in an upward trend.  In other words, the cost of CDS insurance on the panel banks' debt increased more swiftly than the difference between LIBOR and interest rates on OIS, when the two values should have behaved similarly.

261.    In May 2008, after *The Wall Street Journal* reported its LIBOR analysis (detailed above), strategist Tim Bond of Barclays, admitted "the rates the banks were posting to the BBA became a little divorced from reality" during 2007-2008, adding:

> We had one week in September where our treasurer, who takes his responsibilities pretty seriously, said, "Right, I've had enough of this, I'm going to quote the right rates".  All we got for our pains was a series of media articles saying that we were having difficulty financing.[196]

262.    Additionally, in a report published mid-April 2008 entitled "Is LIBOR Broken?", Citigroup's Scott Peng wrote "Libor at times no longer represents the level at which banks extend loans to others."  He concluded that LIBOR was suppressed by 30 basis points.  Peng resigned approximately one year later.  Reports of his resignation referenced his disclosures about LIBOR.  On April 18, 2008, Credit Suisse's William Porter, a credit strategist, estimated an even greater suppression:  40 bps (as reported that day by *The Wall Street Journal*).

---

[196] http://www.telegraph.co.uk/finance/newsbysector/banksandfinance/2790833/Libor-credibility-questioned-by-Barclays-strategist.html.

263.    On April 3, 2008, the Bank of England money-market committee held a meeting of U.K. banks.  The minutes of that meeting state: "U.S. Dollar Libor rates had at times appeared lower than actual traded interbank rates."

264.    As a result of the concerns and statements recounted above, the BBA conducted an inquiry regarding LIBOR.  Notably, shortly after the BBA announced its investigation, the LIBOR panel banks raised their quotes, causing LIBOR to log its biggest increase since August 2007.  Defendants thus falsely and misleadingly signaled that any improper reporting of false rates that may have previously occurred had ended.

265.    Additionally, the BBA ultimately reported that LIBOR had not been manipulated, thus providing further (incorrect) assurance to investors that the concerns expressed by some market participants were unfounded.

266.    After *The Wall Street Journal*'s April 16, 2008 article questioning LIBOR's accuracy, for instance, the BBA engaged in what its executives characterized as a "charm offensive,"[197] contacting investors and journalists to dispel concerns regarding LIBOR.

267.    At that time, the BBA publicly announced it would expel any panel bank that deliberately submitted inaccurate LIBOR quotes.[198]  The BBA also stated it would conduct an expedited "intensive review" of its LIBOR process but that it did not believe panel banks had submitted false quotes.[199]

268.    Moreover, Defendants engaged in a media strategy that diffused the speculation that had arisen concerning LIBOR—and further concealed their conduct.  On April 21, 2008, for instance, Dominic Konstam of Credit Suisse affirmatively stated the low LIBOR rates were attributable to the fact that U.S. banks, such as Citibank and JPMorgan, had access to large customer deposits and borrowing from the Federal Reserve and did not need more expensive

---

[197] David Enrich & Max Colchester, "Before Scandal, Clash over Control of Libor," *The Wall Street Journal*, Sept. 11, 2012, available at http://online.wsj.com/article.SB10000872396390443847404577631404235329424.html.

[198] UBS DOJ Statement ¶ 114.

[199] Carrick Mollenkamp & Laurence Norman, "British Bankers Group Sets Up Review of Widely Used Libor," *The Wall Street Journal*, Apr. 17, 2008, available at http://online.wsj.com/article/SB120838284713820833.html.

1    loans from other banks: "Banks are hoarding cash because funding from the asset-backed

2    commercial paper market has fallen sharply while money market funds are lending on a short

3    term basis and are restricting their supply."[200]

4         269.    Also that day, Jeffrey Rosenberg, head of credit strategy at Banc of America

5    Securities, asserted that the variations in LIBOR resulted from the way the BBA calculates

6    LIBOR. Specifically, he said the BBA's approach "works when both overall bank risk is low and

7    the dispersion of risks across banks is small . . . [which] is clearly not the case currently."[201]  The

8    same article in which Rosenberg's statements were recounted also quoted unidentified "bankers"

9    as stating it was "unlikely that this discrepancy has arisen because banks have deliberately been

10   colluding to keep LIBOR rates down."[202]

11        270.    In an April 28, 2008 interview with the *Financial Times*, Credit Suisse's Konstam

12   continued to defend LIBOR's reliability:

13            Libor has been a barometer of the need for banks to raise capital.
              The main problem with Libor is the capital strains facing banks …
14            Initially there was some confusion that Libor itself was the
              problem, with talk of the rate being manipulated and not
15            representative of the true cost of borrowing.[203]

16        271.    On May 16, 2008, in response to a media inquiry, JPMorgan commented "[t]he

17   Libor interbank rate-setting process is not broken, and recent rate volatility can be blamed largely

18   on reluctance among banks to lend to each other amid the current credit crunch."[204]

19        272.    The same day, Colin Withers of Citigroup assured the public that LIBOR remained

20   reliable, emphasizing "the measures we are using are historic -- up to 30 to 40 years old."[205]

21

22

23   [200] Gillian Tett & Michael Mackenzie, "Doubts Over Libor Widen," FT.com, available at
     http://www.ft.com/cms/s/0/d1d9a792-0fbd-11dd-8871-0000779fd2ac.html#axzz1szdS58jE.

24   [201] *Id.*

     [202] *Id.*

25   [203] Michael Mackenzie, "Talk of quick fix recedes as Libor gap fails to close," FT.com, available at

26   http://www.ft.com/intl/cms/s/0/3da27a46-5d05-11dd-8d38-000077b07658.html#axzz1szdS58jE.

27   [204] Kirsten Donovan, Jamie McGeever, Jennifer Ablan, Richard Leong & John Parry, "European, U.S.
     bankers work on Libor problems," reuters.com, available at
     http://in.reuters.com/article/2008/05/16/markets-rates-bba-idINL162110020080516.

28   [205] *Id.*

273.    And in May 2008, *The Wall Street Journal* asked numerous Defendants to comment on the media speculation concerning aberrations in LIBOR.  Rather than declining or refusing to comment, those Defendants made affirmative representations designed to further conceal their wrongdoing.  On May 29, 2008, for instance, Citibank affirmatively claimed innocence and stated it continued to "submit [its] Libor rates at levels that accurately reflect [its] perception of the market."  HBOS similarly asserted its LIBOR quotes constituted a "genuine and realistic" indication of the bank's borrowing costs.[206]

274.    More recent analyses and investigations by government entities further demonstrates there was insufficient information about *wrongdoing* to put investors, including Plaintiff, on inquiry notice of their claims.  For example, a recently released internal report prepared by the New York Fed in May 2008 observed, "*Beyond the anecdotal evidence and LIBOR re-sets, it is difficult to find convincing evidence of actual misreporting.  Few public sources of data on actual Eurodollar transaction rates exist, and again, the extent of credit tiering makes it difficult to extrapolate from what data there is . . . .*"  (Emphasis added).

275.    Similarly, the FSA—which, as noted above, has been engaged in an intensive and lengthy investigation of LIBOR manipulation—recently observed that the evidence of "dislocation" with respect to LIBOR "did not in itself . . . carry any implication that 'lowballing' was occurring."[207]

276.    Indeed, even the April 16, 2008 *Journal* article that questioned LIBOR's accuracy cautioned "no specific evidence has emerged that banks have provided false information about borrowing costs."[208]

---

[206] Carrick Mollenkamp & Mark Whitehouse, "Study Casts Doubt on Key Rate."

[207] FSA Internal Audit Report, "A Review of the Extent of Awareness within the FSA of Inappropriate Libor Submissions, Management Response," ¶ 1.5 (Mar. 2013), available at www.fsa.gov.uk/static/pubs/other/ia-libor-management-response.pdf.

[208] Mollenkamp, "Bankers Case Doubt on Key Rate Amid Crisis."

1
2
3

**C.      Expert Analysis Performed in Connection with the LIBOR MDL Proceedings Indicates LIBOR's Increase Following Expressions of Concern Over LIBOR's Viability Resulted from Defendants' Attempt to Conceal Their Misconduct.**

4      277.    On April 17, 2008, the day after *The Wall Street Journal* initially reported on

5  LIBOR's anomalous behavior and the BBA stated it would conduct an inquiry concerning

6  LIBOR, there was a sudden jump in USD-LIBOR—the three-month borrowing rate hit 2.8175%

7  that day, about eight basis points more than the previous day's rate of 2.735%.

8      278.    Suspiciously, reported LIBOR rates for other currencies fell or remained relatively

9  flat at the time USD-LIBOR rose, a sign that the latter was susceptible to manipulation.

10      279.    A consulting expert engaged by plaintiffs in the LIBOR MDL Proceedings

11  conducted an analysis of the change in LIBOR on April 17, 2008.  The analysis tested the

12  hypothesis that if banks did not manipulate LIBOR, there would be no systematic changes in

13  LIBOR expected on April 17, whereas if banks did manipulate LIBOR—and were responding to

14  *The Wall Street Journal* article and the BBA's announcement following it—the reporting banks

15  would be likely to reduce or abandon the manipulation immediately in response to those events.

16  An immediate reduction in LIBOR manipulation would result in an increase in LIBOR quotes by

17  the member banks on April 17, 2008.

18      280.    To conduct the analysis, the consulting expert ran a regression using the daily

19  changes in LIBOR.  Table 1 below shows the study results.  As discussed above, LIBOR

20  increased on April 17, 2008 at a statistically significant level.  Moreover, 10 of the 16 bank quote

21  increases were statistically significant.  These findings were consistent with the hypothesis that

22  the banks manipulated and suppressed LIBOR.

23
24
25
26
27
28

**Table 1**

| | Dependent variable | Average change in LIBOR during the period 1/5/2000 – 5/13/2011 | April 17, 2008 Reported Increase | Statistical Significance at the 1-5% level of the April 17, 2008 move |
|---|---|---|---|---|
| | | **Changes in LIBOR on April 17, 2008\*** | | |
| 1 | BBA LIBOR | -0.00203 | 0.08578 | 5% |
| 2 | HSBC LIBOR | -0.00167 | 0.12167 | 1% |
| 3 | JPMC LIBOR | -0.00203 | 0.08203 | 5% |
| 4 | BARCLAYS LIBOR | -0.00202 | 0.10202 | 5% |
| 5 | WEST LB LIBOR | -0.00199 | 0.09199 | 5% |
| 6 | RBS LIBOR | -0.00201 | 0.08701 | 5% |
| 7 | RABOBANK LIBOR | -0.00206 | 0.08206 | 5% |
| 8 | CITI LIBOR | -0.00203 | 0.09703 | 5% |
| 9 | UBS LIBOR | -0.00245 | 0.09745 | 5% |
| 10 | NORIN LIBOR | -0.00204 | 0.09204 | 5% |
| | \*Statistical significance is assessed using a AR(3) model for the residuals. | | | |

281.    An alternative hypothesis is that, in addition to reacting to the *Journal*, other confounding effects that are related to the risk of the banks could have emerged on April 16, 2008 and April 17, 2008.  This alternative hypothesis also predicts an increase in LIBOR.  To test this alternative hypothesis, instead of looking at daily changes in LIBOR quotes, it is possible to see daily changes in the difference between banks' LIBOR quotes and the Federal Reserve Eurodollar Deposit Rate (the "Spread").  If risk related factors played a role, they would affect both the banks' LIBOR quotes as well as the Federal Reserve's Eurodollar Deposit Rate.  Thus, if this hypothesis is correct, one should not see any changes to the Spread on April 17, 2008, since these two effects should cancel out.  However, if there were no risk related news and only a reaction to the *Journal* article and the BBA announcement played a major role, then only LIBOR would be affected, leaving Federal Reserve's Eurodollar Deposit Rate mostly unaffected.  In this case, the Spread would again be expected to increase.

282.    The test of this alternative hypothesis showed that the Spreads of all 16 panel banks increased on April 17, 2008, and, as shown in Table 2 below, 11 of the 16 changes were statistically significant at levels ranging from 1% to 5%.  Once again, these finding were

consistent with the manipulation hypothesis and inconsistent with the hypothesis that other risk factors explained the April 17, 2008 shock to the LIBOR rate.

**Table 2**

| | | | Statistical Significance at the 1-5% level of the April 17, 2008 move |
|---|---|---|---|
| **Changes in Spread on April 17, 2008\*** | | | |
| **Dependent variable** | **Average change in LIBOR during the period 1/5/2000 – 5/13/2011** | **April 17, 2008 Reported Increase** | |
| | | | |
| 1 | BBA LIBOR Spread | -0.00007507 | 0.08383 | 5% |
| 2 | HSBC LIBOR Spread | 0.00024665 | 0.11975 | 1% |
| 3 | JPMC LIBOR Spread | -0.00016117 | 0.08016 | 5% |
| 4 | BARCLAYS LIBOR Spread | -0.00010337 | 0.1001 | 1% |
| 5 | RBS LIBOR Spread | -0.00010924 | 0.08511 | 5% |
| 6 | TOKYO LIBOR Spread | 0.00001534 | 0.07998 | 5% |
| 7 | CITI LIBOR Spread | -0.00016073 | 0.09516 | 5% |
| 8 | CS LIBOR Spread | -0.0001738 | 0.07017 | 5% |
| 9 | RBC LIBOR Spread | -0.00010722 | 0.09511 | 5% |
| 10 | UBS LIBOR Spread | -0.00011816 | 0.09512 | 5% |
| 11 | NORIN LIBOR Spread | -0.00020698 | 0.09021 | 1% |
| \* Statistical significance is assessed using a AR(3) model for the residuals. | | | |

**D.    Investors, Including Plaintiff, Certainly Could Not Have Known or Reasonably Discovered—Until at Least March 2011—Facts Suggesting Defendants _Knowingly Acted_ to Suppress LIBOR.**

283.    Notwithstanding the smattering of statements in late 2007-early 2008 questioning LIBOR's viability, Plaintiff had no reason to suspect—at least until the existence of government investigations was revealed in March 2011—that Defendants were _knowingly acting_ to suppress LIBOR.  Indeed, as a result of Defendants' secret conspiracy and their purposeful concealment of relevant information, no facts arose before March 2011 to put Plaintiff on inquiry notice that a conspiracy to manipulate LIBOR existed.

## PLAINTIFF SUFFERED SIGNIFICANT HARM AS A RESULT OF DEFENDANTS' MISCONDUCT

284.    Throughout the Relevant Period, Panel Bank Defendants' manipulation of LIBOR caused damage to Plaintiff by artificially depressing the interest it received and the value of LIBOR-linked interest-rate swaps it held.

285.    Interest-rate swaps are a type of derivative instrument in which two parties agree to exchange interest rate cash flows, based on a specified notional amount from a fixed rate to a floating rate (or vice-versa) or from one floating rate to another, using different benchmarks for the two floating rates.  Interest-rate swaps are commonly used for both hedging and speculating.  In an interest rate swap, each party agrees to pay either a fixed or floating rate denominated in a particular currency to the other party at specific periods of time.  The fixed or floating rate is multiplied by a notional principal amount.  This notional amount is typically not exchanged between counterparties, but is used only for calculating the size of cash flows to be exchanged.  The counterparty that is required to pay more on the swap can pay the difference instead of both counterparties exchanging monies.  Interest-rate swaps can be indexed to LIBOR.

286.    During the Relevant Period, Plaintiff entered into LIBOR-linked interest-rate swaps with Contracting Defendants.  Because Panel Bank Defendants suppressed LIBOR, Plaintiff received artificially low interest-rate payments on these swaps.  The following transactions serve as examples of LIBOR-linked interest rate swaps obtained by Plaintiff:

a.    An interest-rate swap with Citigroup Financial Products, Inc., dated November 30, 2002 and effective January 14, 2002, that has a notional value of $75 million and amortizes beginning on April 2, 2029 to zero on April 1, 2036.  On this swap, Plaintiff pays monthly a fixed interest rate of 4.10% and receives a floating rate of 65% of one-month LIBOR.

b.    An interest-rate swap with Bank of America, dated November 15, 2005 and effective February 8, 2006, that has a notional value of $30 million and amortizes beginning in 2032 to zero on April 1, 2045.  On this swap, Plaintiff pays monthly a fixed interest rate of 3.633% and receives a floating rate of 68% of one-month LIBOR.

c.    An interest-rate swap with Citibank, dated November 15, 2005 and effective February 8, 2006, that has a notional value of $115 million and amortizes beginning on April 1, 2032 to zero on April 1, 2045.  On this swap, Plaintiff pays monthly a fixed interest rate of 3.6375% and receives a floating rate equal to the sum of (i) 53.80% of one-month LIBOR and (ii) 0.74%.

d.    An interest-rate swap with JP Morgan Chase, dated November 17, 2005 and effective February 8, 2006, that has a notional value of $245 million and amortizes beginning on April 1, 2032 to zero on April 1, 2045.  On this swap, Plaintiff pays monthly a fixed interest rate of 4%.  From February 8, 2006 to but excluding June 1, 2006, BATA received a floating rate of 75.105% of one-month LIBOR.  Since then, BATA receives a floating rate of 67.8% of the ten-year LIBOR.

e.    An interest-rate swap with Bank of America, dated November 30, 2005 and effective November 1, 2007, that has a notional value of $50 million and amortizes beginning on April 1, 2032 to zero on April 1, 2047.  On this swap, Plaintiff pays monthly a fixed interest rate of 3.62550% and receives a floating rate of 68% of one-month LIBOR.

f.    An interest-rate swap with Citibank, dated November 30, 2005 and effective November 1, 2007, that has a notional value of $260 million and amortizes beginning on April 1, 2032 to zero on April 1, 2047.  On this swap, Plaintiff pays monthly a fixed interest rate of 3.636% and receives a floating rate equal to the sum of (i) 53.80% of one-month LIBOR and (ii) 0.74%.

g.    An interest-rate swap with JP Morgan Chase, dated December 1, 2005 and effective November 1, 2007, that has a notional value of $270 million and amortizes beginning on April 1, 2032 to zero on April 1, 2046.  On this swap, Plaintiff pays monthly a fixed interest rate of 4% and receives a floating rate of 69.33% of five-year LIBOR.  This swap was terminated on April 1, 2011.

h.    An interest-rate swap with Bank of America, dated September 2, 2008, that has a notional value of $125 million and amortizes beginning on April 1, 2032 to zero on April 1,

1  2045.  On this swap, Plaintiff pays monthly a fixed interest rate of 3.64180% and receives a

2  floating rate of 68% of one-month LIBOR.

3       287.    During the Relevant Period, Plaintiff also entered into LIBOR-linked interest-rate

4  swaps with other counterparties, including Ambac Financial Services; Morgan Stanley Capital

5  Services, Inc.; Goldman Sachs Mitsui Marine Derivative Products, L.P.; Bank of New York

6  Mellon, N.A.; and Wells Fargo Bank, N.A.  Because Panel Bank Defendants suppressed LIBOR,

7  Plaintiff also received artificially low interest-rate payments on these swaps.

8                                    **CIVIL CONSPIRACY**

9       288.    As set forth above, Defendants, either expressly or tacitly, agreed to suppress

10  LIBOR during the Relevant Period.

11      289.    Defendants each committed numerous acts in furtherance of that agreement,

12  including submitting false LIBOR quotes to the BBA throughout the Relevant Period and actively

13  concealing their misconduct, including by making false or misleading public statements

14  concerning LIBOR.

15      290.    Through their misconduct in artificially suppressing LIBOR during the Relevant

16  Period, Panel Bank Defendants defrauded Plaintiff and other investors in LIBOR-based financial

17  instruments.

18      291.    Defendants' conspiracy harmed Plaintiff by causing it to receive lower returns on

19  LIBOR-based financial instruments and/or to overpay for such instruments.

20      292.    Accordingly, each Defendant is being sued both individually as a primary violator

21  of the law, as stated in this Complaint, and as a co-conspirator.  As a co-conspirator, each

22  Defendant is jointly and severally liable for the fraud committed by its fellow Defendants.

23                      **TOLLING APPLIES TO PLAINTIFF'S CLAIMS**

24      293.    Plaintiff's claims are subject to equitable tolling due to the fraudulent and

25  surreptitious nature of Defendants' misconduct, which Defendants intended to, and did, conceal

26  from Plaintiff and other investors throughout the Relevant Period.  Accordingly, the "discovery

27  rule" applies to Plaintiff's claims, as Plaintiff did not discover, nor had reason to discover, the

28  causes of action set forth in this Complaint, until well after the Relevant Period.

294.    Furthermore, Defendants' misconduct constituted a "continuous violation" as defined under the law, such that the limitations periods for Plaintiff's claims did not accrue until the date of the last wrong or injury that is the subject of this action.

295.    Plaintiff's claims are also subject to tolling under the doctrine endorsed in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and its progeny, by virtue of Plaintiff's status as absent class members in the putative class actions included in the LIBOR MDL Proceedings.  Accordingly, the statutes of limitations and repose applicable to Plaintiff's claims have been tolled as of the date the first putative class action encompassing Plaintiff was filed in the LIBOR MDL Proceedings.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**
**(Against All Defendants)**

296.    Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

297.    Defendants entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

298.    During the Relevant Period, Defendants controlled what LIBOR rate would be reported and therefore controlled prices in the market for LIBOR-based financial instruments. Panel Bank Defendants competed in this market.

299.    The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained or made artificial prices for LIBOR-based financial instruments. Defendants' conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

300.    Defendants' conspiracy, and the resulting impact on the market for LIBOR-based financial instruments, occurred in and affected interstate and international commerce.

301.    As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered injury.

302.    Plaintiff is entitled to treble damages for the violations of the Sherman Act alleged herein.

### SECOND CLAIM FOR RELIEF

### Violation of the Racketeer and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.* (Against All Defendants)

303.    Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

### Defendants Engaged In Conduct Actionable Under RICO.

304.    18 U.S.C. § 1962(c) makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

305.    18 U.S.C. § 1962(d), in turn, makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

306.    Under 18 U.S.C. § 1961(1), and as applicable to Section 1962, "racketeering activity" means (among other things) acts indictable under certain sections of Title 18, including 18 U.S.C. § 1341 (relating to mail fraud), 18 U.S.C. § 1343 (relating to wire fraud), and 18 U.S.C. § 1344 (relating to financial institution fraud).

307.    18 U.S.C. § 1961(5) provides that, to constitute a "pattern of racketeering activity," conduct "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

308.    18 U.S.C. § 1961(3) defines "person" as "any individual or entity capable of holding a legal or beneficial interest in property," and 18 U.S.C. § 1961(4) defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

309.    18 U.S.C. § 1341, the mail fraud statute invoked by 18 U.S.C. § 1961(1) as a predicate act, makes it unlawful to have "devised or intend[ed] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.  If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

310.    18 U.S.C. § 1343, the wire fraud statute invoked by 18 U.S.C. § 1961(1) as a predicate act, provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

311.    18 U.S.C. § 1344, the federal bank fraud statute invoked by 18 U.S.C. § 1961(1) as a predicate act, states:

Whoever knowingly executes, or attempts to execute, a scheme or artifice –

1.    to defraud a financial institution, or

2.      to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises shall be fined not more than $1,000,000 or imprisoned for not more than 30 years, or both.

312.    At all relevant times, Defendants, including the employees who conducted Defendants' affairs through illegal acts (including by communicating false LIBOR quotes to the BBA or directing other employees to do so) were "person[s]" within the meaning of 18 U.S.C. § 1961(4), with a definable corporate structure and a hierarchy of corporate direction and control.

313.    At all relevant times, Plaintiff was a "person" within the meaning of 18 U.S.C. § 1961(3).

**Defendants Formed A RICO Enterprise.**

314.    Defendants' collective association, including through their participation in the BBA's USD-LIBOR panel, constitutes the RICO enterprise in this case.  Every Panel Bank Defendant member of the enterprise participated in the process of misrepresenting their costs of borrowing to the BBA.  Using those false quotes to cause the BBA to set LIBOR artificially low, thereby allowing Panel Bank Defendants to increase their net interest revenues by making artificially low payments to investors such as Plaintiff, constitutes the common purpose of the enterprise.

**The Enterprise Has Perpetrated A Continuing Practice Of Racketeering.**

315.    For at least four years before this Complaint was filed, Panel Bank Defendants, in concert, made false statements to the BBA for the purpose and with the effect of manipulating LIBOR to be lower than it otherwise would have been.  Panel Bank Defendants did so for the purpose and with the effect of decreasing their payments to investors such as Plaintiff and increasing their net interest revenues.  Panel Bank Defendants earned hundreds of millions, if not billions, of dollars in wrongful profits as a result, which they shared with the employees who perpetrated the scheme.  The conduct of every party involved in the scheme is hardly an isolated occurrence that resulted in one fraudulent charge.

316.    In perpetrating the fraudulent scheme, each Panel Bank Defendant directly or indirectly through its corporate structure has designed and implemented a uniform scheme to

manipulate LIBOR.  Panel Bank Defendants' daily making and communicating of quotes to the BBA comprise one common, uniform nearly identical system of procedures used in virtually an identical way every day.

317.    For at least the past four years, Defendants have knowingly, intentionally, or recklessly engaged in an ongoing pattern of racketeering under 18 U.S.C. § 1962(c) by committing the predicate acts of mail fraud within the meaning of 18 U.S.C. § 1341, wire fraud within the meaning of 18 U.S.C. § 1343, and bank fraud within the meaning of 18 U.S.C. § 1344(2), by knowingly and intentionally implementing the scheme to make false statements about their costs of borrowing, to manipulate LIBOR, which allowed Panel Bank Defendants to reap unlawful profits.

318.    Defendants have committed the predicate act of mail fraud under 18 U.S.C. § 1341, thus triggering Section 1962(c) liability, by devising or intending to "devise a scheme or artifice to defraud" purchasers and holders of LIBOR-based financial instruments, and "for the purpose of executing such scheme or artifice or attempting so to do," placed or knowingly caused to be placed in a post office or authorized depository for mail matter, documents or packages to be sent or delivered by the Postal Service or a private or commercial interstate carrier, or received from those entities such documents or packages, including:  (i) documents offering for sale LIBOR-based financial instruments and (ii) correspondence regarding offerings of LIBOR-based financial instruments (the conduct described in this paragraph is referred to as the "Mail Fraud").

319.    On information and belief, the Mail Fraud is the result of Defendants "having devised or intended to devise a scheme or artifice to defraud" holders of LIBOR-based financial instruments, for the purpose of obtaining money from those holders through "false or fraudulent pretenses, representations, or promises."

320.    By devising the scheme or artifice to defraud consumers as described herein, and for obtaining money from holders of LIBOR-based financial instruments through "false or fraudulent pretenses, representations, or promises" about LIBOR-based financial instruments, Defendants transmitted or caused to be transmitted by means of "wire communication in interstate or foreign commerce, . . . writings, signs, signals, [and] pictures," "for the purpose of

executing such scheme or artifice," including by:  (i) transmitting documents offering LIBOR-based financial instruments for sale; (ii) transmitting phony statements about their costs of borrowing; (iii) transmitting e-mail communications relating to the process of determining, making, or transmitting phony statements about their borrowing costs; (iv) collecting funds from Plaintiff via electronic fund transfers or electronic communication with Plaintiff's bank or credit card institution; or (v) transmitting payments to Plaintiff.

321.    In addition to that conduct, Plaintiff is informed and believes Panel Bank Defendants used the mails and wires in conjunction with reaching their agreement to make false statements about their costs of borrowing, to manipulate LIBOR.

322.    Plaintiff does not base its RICO claims on any conduct that would have been actionable as fraud in the purchase or sale of securities.

## THIRD CLAIM FOR RELIEF

### Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, *et seq.*
### (Against All Defendants)

323.    Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

324.    Defendants entered into and engaged in an unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code section 16720.

325.    During the Relevant Period, Defendants controlled what LIBOR rate would be reported and therefore controlled prices in the market for LIBOR-based financial instruments. Panel Bank Defendants competed in this market.

326.    The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, or made artificial prices for LIBOR-based financial instruments. Defendants' conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

327.    Defendants' conspiracy, and the resulting impact on the market for LIBOR-based financial instruments, occurred in and affected interstate and international commerce.

328.    As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered injury.

329.    Accordingly, Plaintiff sees  three times its damages caused by Defendants' violations of the Cartwright Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendants' from ever again entering into similar agreements in violation of the Cartwright Act.

### FOURTH CLAIM FOR RELIEF

### Fraud, Deceit, and Concealment
### (Against All Defendants)

330.    Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

331.    Plaintiff entered into LIBOR-linked interest-rate swaps with Contracting Defendants and other entities.  These included interest-rate swaps where Contracting Defendants paid interest rates expressly based on LIBOR.

332.    Defendants made numerous statements to Plaintiff to induce it to obtain those financial instruments.

333.    Contemporaneous with Plaintiff's transactions, Panel Bank Defendants gave public quotes to the BBA of their supposed costs of borrowing.

334.    In fact, Panel Bank Defendants' quotes to the BBA did not reflect their true costs of borrowing but instead reflected Panel Bank Defendants' scheme to unlawfully manipulate LIBOR.

335.    Panel Bank Defendants never disclosed to Plaintiff the inaccuracy of their quotes to the BBA or that Panel Bank Defendants had manipulated LIBOR to cause it to be lower than it should have been.

336.    The inaccuracy of Panel Bank Defendants' reported quotes and their scheme to manipulate LIBOR were material facts of which Plaintiff was unaware.  If Panel Bank

1    Defendants had disclosed those facts, Plaintiff would not have obtained the subject financial

2    instruments or at least would have demanded appropriately higher interest rates on those

3    instruments.  Plaintiff relied on the accuracy of Panel Bank Defendants' quotes, on the integrity

4    and accuracy of LIBOR, and on the other statements by Defendants that did not include these

5    material omissions.

6         337.    Panel Bank Defendants' concealment of the inaccuracy of their reported quotes

7    and their scheme to manipulate LIBOR damaged Plaintiff because Plaintiff received lower returns

8    (i.e., lower interest rates) than they would have had LIBOR been accurately and honestly set, or

9    had Plaintiff obtained financial instruments not paying interest as a function of LIBOR.

10                            **FIFTH CLAIM FOR RELIEF**

11        **Violation of Section 17200 of the California Business and Professions Code**
          **(Unfair Business Practices)**
12             **(Against All Defendants)**

13        338.    Plaintiff incorporates by reference and realleges the preceding allegations as

14   though fully set forth herein.

15        339.    Defendants have engaged in fraudulent, unfair, and illegal conduct in violation of

16   Section 17200 of the California Business and Professions Code ("Section 17200").  Defendants'

17   conduct was substantially injurious to Plaintiff.

18        340.    Defendants' business acts and practices, as alleged herein, constituted a continuous

19   course of unfair competition by means of unfair, unlawful, or fraudulent business acts or practices

20   in violation of Section 17200, including the following:

21             a.   the violations of federal and state laws as set forth in this Complaint;

22             b.   Defendants' unfair and fraudulent business acts and practices, which induced

23                 investors, including Plaintiff, to purchase and retain the LIBOR-based financial

24                 instruments Defendants or others issued based on falsely-set LIBOR rates, and

25                 Panel Bank Defendants' materially false and misleading statements about their

26                 costs of borrowing, made with knowledge or reckless disregard that they were

27                 materially false or misleading when made.

28

341.    Defendants' misstatements and omissions alleged in this Complaint were material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making decisions concerning purchases of LIBOR-based financial instruments.

342.    Defendants' misstatements and omissions alleged in this Complaint are objectively material to the reasonable consumer, thus reliance upon such misstatements and omissions may be presumed as a matter of law.

343.    Defendants' business acts and practices, as alleged herein, have caused Plaintiff to enter into and retain the subject LIBOR-based financial instruments and, as a result, to suffer losses.

344.    Plaintiff is entitled to full relief, including full restitution or disgorgement of all revenues, earnings, profits, compensation, and benefits Defendants may have obtained as a result of such business, acts, or practices, and an injunction mandating that Defendants cease and desist from engaging in the practices described herein.

## SIXTH CLAIM FOR RELIEF

### Interference with Prospective Economic Advantage
### (Against All Defendants)

345.    Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

346.    As set forth in this Complaint, Panel Bank Defendants manipulated LIBOR in violation of federal and state law.

347.    An economic relationship existed between Plaintiff and issuers or sellers of LIBOR-based financial instruments, which obligated the issuers or sellers to make payments to Plaintiffs at a rate dependent on LIBOR.

348.    Panel Bank Defendants' unlawful manipulation of LIBOR interfered with and disrupted that relationship by defeating the parties' expectations that LIBOR would be set honestly and accurately and would provide a fair benchmark for those LIBOR-based financial

instruments.  As a result, Plaintiff received lower payments on those instruments than it otherwise would have, and overpaid for the instruments, and were damaged thereby.

349.    Defendants acted with the knowledge that interference or disruption of Plaintiff's relationships with issuers or sellers of LIBOR-based financial instruments were certain or substantially certain to result from Panel Bank Defendants' unlawful manipulation of LIBOR.

## SEVENTH CLAIM FOR RELIEF

### Breach of Contract
### (Against Contracting Defendants)

350.    Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

351.    Plaintiff contracted to obtain LIBOR-based financial instruments from Contracting Defendants or dealer entities that were subsidiaries or other affiliates of Contracting Defendants.

352.    Plaintiff performed all of its obligations under the applicable contracts.

353.    All conditions required for Contracting Defendants' performance of those contracts were satisfied.

354.    Contracting Defendants unfairly interfered with Plaintiff's right to receive the benefits of the subject contracts by secretly manipulating LIBOR to be lower than it otherwise would have been, as alleged in this Complaint.  In doing so, Contracting Defendants breached their respective contracts, including the implied covenant of good faith and fair dealing inherent in those contracts, with Plaintiff.

355.    Plaintiff received less interest and lower returns on the LIBOR-based financial instruments than they would have absent Panel Bank Defendants' manipulation of LIBOR, and were therefore harmed.

## EIGHTH CLAIM FOR RELIEF

### Unjust Enrichment
### (Against Contracting Defendants)

356.    Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

357. By means of their unlawful conduct set forth in this Complaint, including misrepresenting their costs of borrowing to the BBA to manipulate LIBOR, Contracting Defendants knowingly acted in an unfair, unconscionable, and oppressive manner toward Plaintiff.

358. Through their unlawful conduct, Contracting Defendants knowingly received and retained wrongful benefits and funds from Plaintiff.  Contracting Defendants thereby acted with conscious disregard for Plaintiff's rights.

359. As a result of their unlawful conduct, Contracting Defendants have realized substantial ill-gotten gains.  Contracting Defendants have unlawfully manipulated LIBOR at the expense of, and to the detriment of, Plaintiff, and to Contracting Defendants' benefit and enrichment.

360. Plaintiff's detriment and Contracting Defendants' enrichment are traceable to, and resulted directly and proximately from, the conduct challenged in this Complaint.

361. Under the common law doctrine of unjust enrichment, it is inequitable to permit Contracting Defendants to retain the benefits they received, and are still receiving, without justification, from their manipulation of LIBOR in an unfair, unconscionable, and oppressive manner.  Contracting Defendants' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

362. The financial benefits Contracting Defendants derived rightfully belong to Plaintiff.  The Court should compel Contracting Defendants to disgorge, in a common fund for Plaintiff's benefit, all unlawful or inequitable proceeds Contracting Defendants received.  The Court should impose a constructive trust upon all unlawful or inequitable sums Contracting Defendants received that are traceable to Plaintiff.

363. Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(A) That the Court enter an order declaring that Defendants' actions as set forth in this Complaint, and in other respects, violate the law;

(B)     That the Court enter judgment awarding Plaintiff damages against Defendants for all economic, monetary, actual, consequential, and compensatory damages Plaintiff suffered as a result of Defendants' conduct, together with pre- and post-judgment interest at the maximum rate allowable by law;

(C)     That the Court award Plaintiff exemplary or punitive damages against Defendants to the extent allowable by law;

(D)     That the Court order the disgorgement of the ill-gotten gains Defendants derived from their misconduct;

(E)     That the Court award Plaintiff restitution of all amounts it paid to Defendants as consideration for financial instruments affected by Defendants' misconduct;

(F)     That the Court issue an injunction prohibiting Defendants from engaging in the misconduct alleged in this Complaint;

(G)     That the Court award Plaintiff its costs of suit, including reasonable attorneys' fees and expenses; and

(H)     That the Court award such other and further relief as the Court may deem just and proper.

Dated:  March 31, 2014              LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP


                                    By: _____
                                            Eric B. Fastiff

                                    Richard M. Heimann (State Bar No. 063607)
                                    Eric B. Fastiff (State Bar No. 182260)
                                    Brendan P. Glackin (State Bar No. 199643)
                                    Marc A. Pilotin (State Bar No. 266369)
                                    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                                    275 Battery Street, 29th Floor
                                    San Francisco, CA 94111-3339
                                    Telephone:  (415) 956-1000
                                    Facsimile:  (415) 956-1008
                                    E-mail:  rheimann@lchb.com
                                            efastiff@lchb.com
                                            bglackin@lchb.com
                                            mpilotin@lchb.com

Steven E. Fineman (State Bar No. 140335)
Michael J. Miarmi
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592
E-mail:  sfineman@lchb.com
         mmiarmi@lchb.com

Adrienne D. Weil (State Bar No. 108296)
General Counsel
METROPOLITAN TRANSPORTATION COMMISSION
and BAY AREA TOLL AUTHORITY
101 8th Street
Oakland, CA 94607
Telephone: (510) 817-5830
E-mail: aweil@mtc.ca.gov

*Attorneys for Plaintiff Bay Area Toll Authority*

1    ## DEMAND FOR JURY TRIAL

2         Plaintiff hereby demands a trial by jury of all issues so triable.

3

4    Dated:  March 31, 2014              LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

5

6                                         By:  _Eric B. Fastiff_
                                                Eric B. Fastiff

7

8                                         Richard M. Heimann (State Bar No. 063607)
                                          Eric B. Fastiff (State Bar No. 182260)

9                                         Brendan P. Glackin (State Bar No. 199643)
                                          Marc A. Pilotin (State Bar No. 266369)

10                                        LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                                          275 Battery Street, 29th Floor
                                          San Francisco, CA 94111-3339

11                                        Telephone:  (415) 956-1000
                                          Facsimile:  (415) 956-1008

12                                        E-mail:  rheimann@lchb.com
                                                   efastiff@lchb.com

13                                                 bglackin@lchb.com
                                                   mpilotin@lchb.com

14

15                                        Steven E. Fineman (State Bar No. 140335)
                                          Michael J. Miarmi

16                                        LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                                          250 Hudson Street, 8th Floor
                                          New York, NY 10013-1413

17                                        Telephone:  (212) 355-9500
                                          Facsimile:  (212) 355-9592

18                                        E-mail:  sfineman@lchb.com
                                                   mmiarmi@lchb.com

19

20                                        Adrienne D. Weil (State Bar No. 108296)
                                          General Counsel

21                                        METROPOLITAN TRANSPORTATION COMMISSION
                                          and BAY AREA TOLL AUTHORITY

22                                        101 8th Street
                                          Oakland, CA 94607

23                                        Telephone: (510) 817-5830
                                          E-mail: aweil@mtc.ca.gov

24

25                                        *Attorneys for Plaintiff Bay Area Toll Authority*

26

27

28